2003 OK 88

**Debra DELK, Plaintiff,**

v.

**MARKEL AMERICAN INSURANCE COMPANY, a Virginia Corporation, Defendant.**

**No. 99,117.**

Supreme Court of Oklahoma.

Oct. 21, 2003.

Rehearing Denied Dec. 15, 2003.

---

Peter J. Ram and James A. Belote, Stipe Law Firm, Oklahoma City, OK, for plaintiff.

Bruce V. Winston, Walker, Ferguson & Ferguson, Oklahoma City, OK, for defen-

dant.[1]

OPALA, V.C.J.

¶1 The United States District Court for the Western District of Oklahoma (certifying court) certified a question of law pursuant to the Revised Uniform Certification of Questions of Law Act, 20 O.S.2001 § 1601 *et seq.*[2] We have reformulated the question as authorized by § 1602.1of the Act.[3] We answer the following reformulated question:

> May an insured cotenant who occupies the insured property as her home and who has insured the property for its full value recover (within the policy limits) more than the value of her fractional legal interest in the property? [4]

We answer this reformulated question in the affirmative.

## I

### THE ANATOMY OF FEDERAL LITIGATION[5]

¶2 In April 1998 James Delk executed a warranty deed conveying equal fractional interests in his residence to six of his relatives, including his daughter, Debra Delk (plaintiff or Delk). The other five cotenants named in the deed are plaintiff's adult son, John, his minor children, Julian and Cheyenne Delk, plaintiff's minor son, Tanner Mabry, and plaintiff's adult nephew, Cody Delk. Plaintiff lived in the home with John and his family until it was destroyed by fire in September 2001.

¶3 Markel American Insurance Company (defendant) in May 1999 issued to plaintiff as the sole named insured a homeowner's policy covering the residence. The application did not ask plaintiff about the nature or extent of her legal title. Plaintiff contends that she informed defendant she was taking over as policyholder from her father and that she would be making the premium payments. Plaintiff renewed the policy on a yearly basis at an annual premium of $786.00. The policy was in force and effect when the house was destroyed by fire. The policy limits for dwelling coverage stand at $104,000.00.[6] The policy at issue is the only property insurance covering the home. Plaintiff alone paid the annual premiums. She and her adult son, John, contend they had an understanding that plaintiff would obtain insurance on the home and that she alone would be entitled to any proceeds recovered in the event of an insured loss.

¶4 When the home was destroyed by fire in September 2001, plaintiff made a claim under the policy for the amount of the policy's dwelling coverage limits. Defendant learned while investigating the claim that plaintiff owned only a one-sixth interest in the insured property. Defendant then de-

---

1. Identified herein are those counsel for the parties whose names appear on the briefs filed in this court.

2. The provisions of 20 O.S.2001 § 1602 state:

   "Power to Answer. The Supreme Court and the Court of Criminal Appeals may answer a question of law certified to it by a court of the United States, or by an appellate court of another state, or of a federally recognized Indian tribal government, or of Canada, a Canadian province or territory, Mexico, or a Mexican state, if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling decision of the Supreme Court or Court of Criminal Appeals, constitutional provision, or statute of this state."

3. The provisions of 20 O.S.2001 § 1602.1 state:

   "Power to Reformulate Question. The Supreme Court of this state may reformulate a question of law certified to it."

4. The question certified to us by the federal court inquires:

   "What is the insurable interest of a property owner who, along with five co-tenants, owns an undivided one-sixth interest in an insured dwelling and who utilizes the dwelling as her residence?"

5. The material accompanying the federal court's certification order consists of the pleadings, the parties' motions for summary adjudication with attached exhibits, and briefs in support of and in opposition to the motions. The parties submitted additional briefs to this court at our request.

6. The policy also provides other coverage in the following amounts:

   Other Structures Coverage—$10,400.00.
   Personal Property Coverage—$41,600.00.
   Additional Living Cost and Fair Rental Value—$10,400.00.
   Personal Liability—$25,000.00.
   Medical Payment to Others—$500.00.

nied plaintiff's claim as to all but one-sixth of the policy limits on the grounds that her insurable interest—and hence the insurer's indemnification duty—was limited to plaintiff's fractional share of the property's ownership.

¶5 Plaintiff then brought this action against defendant in the United States District Court for the Western District of Oklahoma for breach of contract and breach of the insurer's implied duty of good faith and fair dealing. Both parties moved for summary judgment.[7] Unable to determine how Oklahoma law would quantify plaintiff's insurable interest in the home, the federal district court judge submitted to this court the certified question of law which we answer today as reformulated.

## II

## THE NATURE OF THE COURT'S FUNCTION WHEN ANSWERING QUESTIONS FROM A FEDERAL COURT

■ ¶6 In answering questions posed by a federal court, the parameters of state-law claims or defenses identified by the submitted questions may be tested, but it is not this court's office to intrude (by its responses) upon the certifying court's decision-making process.[8] The latter must be left entirely free to assess the impact of our answers and then make its own appraisal of the proof in the case before it.[9]

¶7 Because this case is not before us for decision, we refrain (as we must) from applying the declared state-law responses to the facts in the federal-court litigation, which have been tendered for review by the certifying court either in the form of evidence adduced at trial or by acceptable probative substitutes (so-called "evidentiary materials").[10] The task of analyzing today's answer for its application to this case is deferred in its entirety to the certifying court.

## III

## THE PURPOSE OF THE INSURABLE INTEREST REQUIREMENT AND THE GUIDING PRINCIPLE BEHIND ITS IMPLEMENTATION IN OKLAHOMA

■ ¶8 An insurance contract is valid and enforceable only to the extent that the insured has an insurable interest in the subject matter of the policy.[11] This requirement has long been a part of Oklahoma's common law[12] and also stands today as a statutory prerequisite for the validity of an insurance contract.[13] The pertinent subsection of 36 O.S.2001 § 3605 states: "No insurance contract on property or of any interest therein or arising therefrom shall be enforceable as to the insurance except for the benefit of persons having an insurable interest in the things insured."[14] The insurance policy at issue in this case also contains a provision limiting defendant's liability to the insurable interest an insured person has in property covered by the policy.[15]

¶9 An insurable interest is the relationship or connection a person must have with the

7. Plaintiff moved for summary judgment on the breach of contract claim alone, while defendant moved for summary judgment on both the breach of contract claim and on the claim for breach of the insurer's implied duty of good faith and fair dealing. Only the breach of contract claim is directly implicated in today's answer.

8. See Uniform Laws Annotated, Uniform Certification of Questions of Law Act/Rule (1995); Goldschmidt, Certification of Questions of Law; Federalism in Practice, American Judicature Society (1994).

9. See, e.g., Shebester v. Triple Crown Insurers, 974 F.2d 135, 137 (10th Cir.1992).

10. Schmidt v. United States, 1996 OK 29, ¶7, 912 P.2d 871, 873; Brown v. Ford, 1995 OK 101, ¶4, 905 P.2d 223, 226; Bonner v. Okla. Rock Corp., 1993 OK 131, ¶2, n. 3, 863 P.2d 1176, 1178, n. 3; Shebester v. Triple Crown Insurers, 1992 OK 20, ¶8, n. 4, 826 P.2d 603, 606, n. 4.

11. Fireman's Fund Ins. Co. v. Cox, 1918 OK 570, ¶5, 71 Okla. 97, 175 P. 493, 493.

12. Id.

13. 36 O.S.2001 § 3605.

14. See 36 O.S.2001 § 3605.A.

15. The policy states in relevant part, "In the event of a loss, we will not pay for more than the insurable interest that an insured person has in the property covered by this policy ...."

subject matter of an insurance policy in order to insure it. The insurable interest doctrine developed over the course of several centuries in response to certain public policy concerns related to insurance. The foremost historical justification for the insurable interest requirement [16] was to prohibit wagering contracts in the guise of insurance.[17] Odd as it may strike us today, insurance as an instrument of wagering was a common and accepted practice in mid-eighteenth century England.[18] Parliament, responding to the

**16.** *See* the following articles and treatises touching on the origin of the insurable interest doctrine: Bertram Harnett and John V. Thornton, *"Insurable Interest in Property: A Socio–Economic Reevalution of a Legal Concept,"* 48 COLUM. L.REV. 1162, 1178–1183 (1948); William T. Vukowich, *"Insurable Interest: When It Must Exist in Property and Life Insurance,"* 7 WILLAMETTE L.J. 1, 1 (1971); Robert Stuart Pinzur, *"Insurable Interest: A Search for Consistency,"* 46 INS. COUNSEL J. 109, 110–111 (1979); Emeric Fischer, *"The Rule of Insurable Interest and the Principle of Indemnity: Are They Measures of Damages in Property Insurance?"* 56 IND. L.J. 445, 446 (1981); Johnny C. Parker, *"Does Lack of an Insurable Interest Preclude an Insurance Agent from Taking an Absolute Assignment of His Client's Life Policy,"* 31 U RICH. L.REV. 71 (Jan. 1997); Hugh J. Fegan, *"Notes on the Development of the Doctrine of Insurable Interest,"* 8 GEO L.J. 1–13 (1919); Gary I. Salzman, *"The Law of Insurable Interest in Property Insurance,"* 1966 INS. L.J. 394, 394–96; Robert E. Keeton and Alan I. Widiss, INSURANCE LAW: A GUIDE TO FUNDAMENTAL PRINCIPLES, LEGAL DOCTRINES, AND COMMERCIAL PRACTICES, § 3.1(c) at 136–137 (Student ed.1988); Jeffrey W. Stempel, LAW OF INSURANCE CONTRACT DISPUTES § 1.04[a] and [b] at 1–17–1–23 (1999); and E.J. MacGillivray, INSURANCE LAW 104 *et seq.*(1912).

**17.** *See* Keeton and Widiss, *supra* at 138.

**18.** Gambling was the "pet vice" of seventeenth and eighteenth century England and the courts' attitude toward the practice "reflected popular feeling." Fegan, *supra* note 16 at 7–8. Hence, before Parliament intervened, most forms of wagering were valid at common law and wagering agreements were generally enforceable in English courts. MacGillivray, *supra* note 16 at 104. The courts' practice of enforcing wagers *per se* was applied in the eighteenth century to the enforcement of wagers in the form of marine and life insurance policies, but the early English decisions with respect to fire insurance took the opposite view. *See Sadlers Co. v. Badcock,* 2 Atk. 554, 26 Eng. Rep. 733 (1743), in which Lord Hardwicke explained that fire insurance did not have the same history or attributes as marine insurance and that for fire insurance to be enforceable the insured must have an interest in the property insured. *Id.* at 556, 26 Eng. Rptr. at 734. *See also Lynch v. Dalzell,* 4 Bro. P.C. 431, 2 Eng. Rep. 292 (1729).

Even with respect to marine insurance, it has been suggested that the belief that the common law approved of wagering in that type of insurance may rest on a fallacy. The notion that the courts would enforce wagering policies on ships is usually traced to the case of *Depaba v. Ludlow,* 1 Comyns 361, 92 Eng. Rep. 1112 (1721), in which the plaintiff contracted for marine insurance "interest or no interest." When the ship was lost, the plaintiff sought recovery under the policy. The court held that the clause "interest or no interest" in the contract constituted a valid and enforceable waiver by the insurer of proof of interest at trial. The decision appears to assume that the plaintiff had an interest in the insured property and clearly did not hold that wagering policies were valid, but only that parties to an insurance contract were free to agree to a waiver of proof of interest at trial. Nevertheless, the effect of *Depaba's* holding was to provide an apparent legal justification for using marine insurance as an instrument of wagering. In a short time, the practice became so widespread and socially invidious that Parliament was forced to act, passing in 1746 a statute prohibiting the purchase of marine insurance by those without an interest in the subject. *See* the provisions of 19 Geo. II, c. 37 (1746), discussed *infra* note 20.

When the question later arose in Craufurd v. Hunter, 8 T.R. 13, 101Eng. Rptr. 1239(1798), whether plaintiffs could recover under a marine insurance policy without alleging they had an interest in the ships, Lord Kenyon, viewing the 1746 statute as Parliamentary recognition that before the statute's passage insurance could be procured without interest, opined that "at common law a person might have insured without having any interest," *Id.* at 23, 101 Eng. Rptr. at 1245. Commenting on Lord Kenyon's view of the common law, *Lord Eldon in Lucena v. Craufurd,* 2 Bos. & Pul. 269, 127 Eng. Rptr. 630 (1806), expressed doubt that Lord Kenyon had correctly stated the rule, opining that the early decisions did no more than dispense with proof of interest at trial and the statute merely addressed the problems that arose from dispensing with that proof. *Id.* at 321–22, 127 Eng. Rptr. 650–651.

For a discussion of how the doctrine that wagering policies on ships were valid at common law inadvertently arose and of how that doctrine came to apply to life insurance as well, *see Ruse v. Mutual Benefit Life Ins. Co.,* 23 N.Y. 516 (1861). *But see,* MacGillivray, *supra* note 16 at 104, who argues that although the interest or no interest clauses were originally included in legitimate insurance contracts to permit an insured to recover at trial without going to the trouble of proving his interest, they were in fact upheld by the English courts even after it was clear that they had become nothing but a subterfuge for gambling. *Id.*

pernicious effects of this practice,[19] passed a series of statutes beginning in the middle of the eighteenth century requiring as a prerequisite for the validity and enforceability of an insurance contract that the insured have an interest in the contract's subject matter.[20] While the historical anti-wagering foundation of the insurable interest doctrine remains valid, other public policy objectives have greater resonance today.[21] The distinction between wagering and insurance is now so firmly established in public perception,[22] that the justification for the insurable interest doctrine is more readily apprehended today as the prevention of unproductive and wasteful commercial transactions,[23] the limitation of insurance to true indemnity,[24] and the deterrence of the fraudulent destruction of insured property.[25]

¶ 10 The doctrine of insurable interest initially entered American jurisprudence by

19. The detrimental effects of wagering have often been noted. In one commentator's words, the unearned gains that come from wagering "lead to idleness, and the wagerer becomes a social parasite. Useful business and industry are thereby discouraged. On the moral side, idleness leads to vice; and the impoverishment of the loser entails misery, and, in consequence, crime." Edwin W. Patterson, *"Insurable Interest in Life,"* 18 Colum. L.Rev 381, 386 (1918).

20. The first of these statutes, 19 Geo. II, c. 37 (1746), prohibited the procurement of marine insurance without proof of interest. In the preamble, Parliament noted that insurance had become "a mischievous kind of gaming," and a justification for the fraudulent destruction of insured property. *Id.* at § 1. Approximately thirty years later, Parliament enacted a similar restriction on life insurance, 14 Geo. III, c. 48 (1774), in response to wagering on lives and events in which the insured had no interest. *See* Roy Kreitner, *"Speculations of Contract, or How Contract Law Stopped Worrying and Learned to Love Risk,"* 100 Colum. L.Rev. 1096, 1099 (May 2000). After its initial introduction into England at the beginning of the eighteenth century, life insurance became increasingly speculative so that by the time Parliament acted to outlaw life insurance without interest, gambling in lives had become quite bold and tasteless. Insurance was written on the lives of famous people, on the outcome of battles, on who would be the next mistress of the French monarch, on jury verdicts, and on various other life and death matters in which the insured had no personal stake in the outcome other than the profit he might make from tragedy or hardship befalling strangers. *See* Lorraine J. Daston, *"The Domestication of Risk: Mathematical Probability and Insurance 1650–1830,"* in 1The Probabilistic Revolution 237, 244 (1987).

21. Keeton and Widiss, *supra* note 16 at 138. Nevertheless, recent judicial decisions continue to rely on the avoidance of gambling as one of the principle rationales behind the insurable interest requirement. *Id.*

22. "While in a broad semantic sense all insurance contracts are wagers, the notion has developed in the law that if there is an interest in the subject matter of the insurance, independent of the occurrence of the insured event, then there is no wager." Harnett and Thornton, *supra* note 16 at 1184. The persistence of the perception of insurance and gambling as two sides of the same coin is evident in the following passage from the 1898 treatise, The History of Gambling in England, by John Ashton:

"[P]aradoxical as it may appear, there is a class of gambling which is not only considered harmless, but beneficial, and even necessary—I mean Insurance. Theoretically, it is gambling proper. You bet 2s. 6d. to £100 with your Fire Insurance; you equally bet on a Marine Insurance for the safe arrival of your ships or merchandise; and it is also gambling when you insure your life." *Id.* at 275.

23. Keeton and Widiss, *supra* note 16 at 138. ("The argument is that allowing the purchase of insurance as a wager for fortuitous profits rather than as a means of securing protection against fortuitous losses, is unproductive. Such contracts do not, either directly or indirectly, provide any needed service or aid in the making of any product, and in these circumstances, the administrative costs of making such contracts available result in a net societal loss.").

24. Harnett and Thornton, *supra* note 16 at 1183. The principle of indemnity is fundamental to insurance law. It holds that insurance payments are restricted to an amount which will compensate the insured for the loss suffered from the impairment of the insured property. While limiting insurance to indemnity is usually enumerated as a distinct purpose of the insurable interest doctrine, it is in reality little more than another aspect of the policies against wagering and against fostering the temptation to destroy insured property. It is "the wagering policy accoutered in different verbal cloth." *Id.*

25. Harnett and Thornton, *supra* note 16 at 1181–1183 ("The theory behind this policy is simple: if the insured has no "interest" in the subject matter of the insurance, he is likely to destroy the subject matter in order to gain the benefit of the insurance." After presenting the theory, Harnett and Thornton proceed to debunk it, concluding that the insurable interest requirement not only does not minimize this temptation, but actually increases it.).

way of decisional law, but many jurisdictions have over the years enacted insurable interest statutes. While American jurisdictions generally agree on the necessity of an insurable interest, they are divided on what constitutes such an interest. The nature of the interest that qualifies as insurable has changed over time and is gradually broadening.[26] Two competing theories have evolved for measuring the nexus which must be present between the property and its insured for an insurable interest to attach. The literature refers to one of these as the "legal interest" theory[27] and to the other as the "factual expectation" theory.[28]

¶ 11 In *Snethen v. Oklahoma State Union of the Farmers Educational and Cooperative Union of America*,[29] we adopted the factual expectation theory of insurable interest.[30] Under this theory there is an insurable interest in property if the insured would gain *some economic advantage* by its continued existence or would suffer *some economic detriment* in case of its loss or destruction.[31] This is also the theory espoused by the provisions of 36 O.S.2001 § 3605.B., which define insurable interest as: "any actual, lawful, and substantial economic interest in the safety or preservation of the subject of the insurance free from loss, destruction, or pecuniary damage or impairment."[32] *Snethen* held that the word "law-

---

**26.** Fagen, *supra* note 16 at 2.

**27.** While the statutes passed in the eighteenth century required that an "interest" be present, it was left to the judiciary to decide the nature of the connection to the property (or life) which would qualify as an "interest." The legal interest theory requires that the insured's expectation of benefit from the continued existence of the subject of the insurance be based on a legally or equitably cognizable interest in the property. This view has its roots in Lord Eldon's opinion in Lucena v. Craufurd, *supra* note 18, where he reasoned that "expectation though founded on the highest probability, [is] not interest," *Id* at 321, 127 Eng. Rptr. at 650, and "if moral certainty be a ground of insurable interest, there are hundreds, perhaps thousands, who would be entitled to insure" the same property. *Id.* at 324, 127 Eng. Rep. at 651. The legal interest theory recognizes as insurable not only the interest of fee holders, but also those of life tenants (*Farmers' Mut. Fire & Lightning Ins. Co. v. Crowley*, 354 Mo.649, 190 S.W.2d 250 (1945)); remaindermen, *(Id.)*; reversioners (*Convis v. Citizens' Mut. Fire Ins. Co.*, 127 Mich.616, 86 N.W.994 (1901)); lessors (*Hale v. Simmons*, 200 Ark.556, 139 S.W.2d 696 (1940)); lessees *(Id.)*; mortgagees (*Allen v. St. Paul Fire & Marine Ins. Co.*, 167 Minn.146, 208 N.W.816 (1926)); pledgees (*Dunsmore v. Franklin Fire Ins. Co.*, 299 Pa.86, 149 A.163 (1930)); and lienholders (*Hayward Lumber & Inv. Co. v. Lyders*, 139 Cal.App.517, 34 P.2d 805 (1934)).

**28.** The factual expectation theory also has its roots in Lucena v. Craufurd, *supra* note 18. In a separate opinion in that case, Lord Lawrence said,
"that insurance is a contract by which one party in consideration of a price paid to him adequate to the risk, becomes security to the other, that he shall not suffer loss, damage, or prejudice by the happening of the perils specified to certain things which may be exposed to them. If this be the general nature of the

contract of insurance, it follows that it is applicable to protect men against uncertain events which may in any wise be of disadvantage to them; not only those persons to whom positive loss may arise by such events, occasioning the deprivation of that which they may possess, but those also who in consequence of such events may be intercepted from the advantage or profit, which but for such events they would acquire according to the ordinary and probable course of things.... To be interested in the preservation of a thing, is to be so circumstanced with respect to it as to have benefit from its existence, prejudice from its destruction." *Id.* at 301–302, 127 Eng. Rptr. at 642–43.

**29.** 1983 OK 17, 664 P.2d 377.

**30.** *Id.* at ¶ 9, 664 P.2d at 380.

**31.** *Id.* at ¶ 8, 664 P.2d at 380. *See also Granite State Ins. Co. v. Lowe*, 362 So.2d 240, 241(Ala.Civ.App.1978) (construing statutory language identical to § 36 O.S.2001 § 3605 and holding that the statute espouses the factual expectation theory of insurable interest).

**32.** The factual expectation theory has come to enjoy widespread legislative and judicial support. For an enumeration of jurisdictions with a similar or identical definition of insurable interest to that recognized in Oklahoma, *see* Parker, *supra* note 16 at 109, n. 7. *See also Harrison v. Fortlage*, 161 U.S. 57, 65, 16 S.Ct. 488, 490, 40 L.Ed. 616 (1896), where at the end of the nineteenth century the United States Supreme Court called the factual expectation theory of insurable interest "well settled." It is the preferred theory among legal commentators. *See e.g.* Harnett and Thornton, *supra* note 16 at 1188; 3 G. Couch, Cyclopedia of Ins. Law § 24.13 (2d ed.1984); Salzman, *supra* note 16 at 405; Pinzur, *supra* note 16 at 111; Note, "*Insurable Interest in Property: An*

ful" as used in § 3605.B. is not synonymous with the word "legal" and does not require the application of the legal interest theory, but is merely used in the sense that the interest was not acquired in violation of the law.[33]

¶ 12 The purpose of the insurable interest requirement must stand at the center of any analysis of the doctrine's application. This is so whether the inquiry concerns the complete presence or absence of an insurable interest or whether, as here, it concerns the extent or measure of an insurable interest. Judicial consideration must be given to whether the contract suggests an element of wager on the part of the insured, i.e. whether it appears that the insured was betting on the loss of property with which he (or she) had little or no connection. The court must also consider whether recovery by the insured would exceed the loss actually suffered, thereby providing motivation for destroying the property. The insurable interest requirement

should not be extended beyond the reasons for its existence by an overly technical construction that frustrates the legitimate expectations of the insured or that permits an insurer to avoid the very risk it intended to insure. With these considerations in mind, we address the extent of this plaintiff's insurable interest under Oklahoma law.

## IV

### THE INSURABLE INTEREST OF A CO-TENANT IN POSSESSION MAY EXCEED THE QUANTUM OF HIS (OR HER) FRACTIONAL LEGAL ESTATE IN THE COTENANCY PROPERTY WHERE THE INSURING CO-TENANT ACTS AS THE MANAGING AGENT FOR THE JOINT OWNERS[34]

■ ¶ 13 Defendant invokes the oft-repeated statement that a cotenant's insurable interest is limited to his (or her) interest in the property.[35] While we agree with this as

*Expanding Concept,"* 44 Iowa L.Rev. 513–522 (1958). The factual expectation theory is employed in the definition of insurable interest provided in C. Bennett, Dictionary of Insurance 178 (1992) ("the insured must be in a legally recognised relationship with the subject-matter of insurance whereby he benefits by its safety or absence of liability and is prejudiced by its damage or destruction or creation of liability.").

33. *Snethen, supra* note 29 at ¶ 13, 664 P.2d at 381.

34. Defendant argues that this court should not consider whether plaintiff has an insurable interest as managing agent of the property for the family's benefit because plaintiff did not allege or tender evidentiary material establishing that an agreement regarding the procurement of insurance existed between plaintiff and anyone other than her adult son, John. Defendant contends that consideration of this argument would hence violate the stricture in *Jones v. University of Central Oklahoma,* 1995 OK 138, ¶ 5, 910 P.2d 987, 989, that we may not presume any facts outside those offered by the certification order. The separate writing of the partially concurring justice agrees with defendant on this point, but we disagree. While neither the certification order nor the pleadings employ the word agent or agency, the certification order clearly sets forth *the facts necessary for a consideration of an agency relationship.* Together, plaintiff, her son, John, and the three minor children account for five of the six cotenants. If, as we suggest *infra* note 45, the adults can act on behalf of their

children in insuring the property, five/sixths of the legal interests in the property would be covered by the understanding between plaintiff and John that plaintiff was to insure the premises. We agree that the certification order is silent as to any agreement or understanding plaintiff may have had with the remaining cotenant, her adult nephew, and today's pronouncement does not presume that such an agreement or understanding existed. Whether plaintiff acted as the agent of her sons and her grandchildren does not hinge upon whether she had a similar agreement or understanding with the remaining cotenant. The presence or absence of that agreement or understanding would only affect plaintiff's right to recover the policy's proceeds attributable to the remaining cotenant's interest. It is not for this court to determine whether plaintiff may or may not at this stage of the federal proceeding offer proof—if it exists—of an agreement or understanding with her nephew regarding the purchase of insurance covering the dwelling. It is our task to provide the federal court with a range of scenarios, if any, that would militate in favor of or against recovery. It is for the federal court upon an evidentiary hearing to determine whether the plaintiff has tendered proof of facts that do indeed support her claim.

35. *See e.g.* 3 Couch on Insurance 3d, § 42:45 (1997), which states:

"A tenant in common has an insurable interest to the extent of his or her interest in the property ... When a part owner insures his or her individual interest, he or she need not specify the nature of his or her interest, but it

a general proposition, we note that it is an abstraction that begs the question of what qualifies as an interest. Defendant argues that the intent of the general proposition is to limit a cotenant's interest to the quantum of his (or her) legal title. We grant that under some circumstances a cotenant's insurable interest may properly be so limited, but we regard Oklahoma's factual expectation approach to insurable interest as authorizing under proper circumstances recovery by a cotenant of more than the cotenant's fractional interest in the insured property.

■ ¶ 14 Tenancy in common is a joint interest in property.[36] Its only essential element is a unity of the right of possession.[37] While each tenant in common has a separate and distinct title which is held independently of the other cotenants,[38] each stands to the other in a relation of mutual trust and confidence.[39] One tenant in common may not act or claim "in derogation of"[40] the interest of the other joint owners.[41] This means that a cotenant is not allowed to lessen or diminish the value or effect of the other cotenant's right, title, interest or status in the land.[42]

■ ¶ 15 While none of these attributes of cotenancy places an affirmative duty on one cotenant to insure the common property for the benefit of the other joint owners, cotenants clearly have a mutual and reciprocal interest in the safety and preservation of the common property. This is especially true where the cotenants are all family members and the common property is the residence of some or all of them. Each has a reciprocal expectation of economic advantage from the home's continuing existence and its availability as a residence for the others. When the residence is destroyed, the occupants lose more than their individual fractional legal interests in the property. Before the home's destruction, they all have a place to live. Afterwards, they are homeless and must go to the expense of securing another home.

■ ¶ 16 In such a case it would not be unusual for one of the resident cotenants to be given the responsibility of maintaining and protecting the property for the benefit of the other co-owning family members. A cotenant who has assumed or who has been given such general managerial authority over the property is free to exercise that authority by taking any measure which a reasonably prudent person in that position would take to protect the property, including purchasing insurance for the benefit of all joint owners.[43] A tenant in common who manages family-owned property which serves as the resi-

---

is essential that he or she not insure for more than his or her interest...."

36. *DeMik v. Cargill*, 1971 OK 61, ¶ 12, 485 P.2d 229, 233.

37. *Matthews v. Matthews*, 1998 OK 66, ¶ 11, 961 P.2d 831, 834. The common law concept of unity of possession means that each cotenant is entitled to occupy every part of the co-owned property regardless of the quantum of the occupier's fractional interest, subject only to the other cotenants' equal right of possession.

38. *Id.*

39. *Rex Oil Refining Inc. v. Shirvan*, 1967 OK 127, ¶ 24, 443 P.2d 82, 87.

40. The term "derogation" is "[o]rdinarily used to indicate an avoidance of; the abrogation of; or *the lessening in value of, a right or other legal relationship or status.*" JOHN M. CARTWRIGHT, GLOSSARY OF REAL ESTATE LAW 270 (1972) (emphasis supplied). For an in-depth discussion of the term, *see Sharon v. Sharon*, 75 Cal. 1, 16 P. 345, 370 (1888) (Thornton, J., dissenting) (stating that "[d]erogation is ... the act of taking away or destroying the value or effect of anything, or of

limiting its extent, or of restraining its operation; ...").

41. *Rex Oil Refining*, supra note 39 at ¶ 24, 443 P.2d at 87 (cotenants stand to each other in a relation of mutual trust and confidence; neither will be permitted to act in hostility to the other in reference to the joint estate); *Wallace v. Brooks*, 1944 OK 76, ¶ 35, 194 Okla. 137, 147 P.2d 784, 790 (an outstanding adversary title acquired by a cotenant inures to the benefit of the other cotenants); *Burt v. Steigleder*, 1928 OK 349, ¶ 12, 132 Okla. 217, 270 P. 54, 55–56 (a purchase of an outstanding adverse title by a cotenant will be held in equity to have been made for and on behalf of all the cotenants); *Arthur v. Coyne*, 1912 OK 243, ¶ 5, 32 Okla. 527, 122 P. 688, 690.

42. *Matthews*, supra note 37 at ¶ 11, 961 P.2d at 835.

43. *Gray v. Holman*, 1995 OK 118, ¶ 7, 909 P.2d 776, 779–80 (recognizing that a mother with no legal estate in her son's property might nevertheless, acting as her son's agent, insure the son's property in her own name but on her son's behalf).

dence of all or some of the family clearly has a substantial economic interest in the continued existence of the property both as an individual and as the representative of the family.

▇▇▇▇▇ ¶17 Whether Delk was in fact authorized by the other cotenants as their agent to secure fire coverage for the co-owned premises is a question of fact for resolution by the certifying court.[44] We would only note here that the realities of a cotenancy relationship in which the cotenants are all family members, some or all of whom occupy the premises as their home, suggest that something less than a formal agreement would suffice to establish the requisite agreement or understanding.[45]

¶18 The provisions of 36 O.S.2001 § 3605.C. state, "The measure of an insurable interest in property is the extent to which the insured *might be damnified* by loss, injury, or impairment thereof." The statutory formulation is simply another way of saying that the insured may recover the amount which will indemnify him (or her) for the loss suffered. Indemnification is measured by the extent to which the insured has been economically impacted by the happening of the insured event. Assuming the existence of the requisite agency relationship between plaintiff and her co-owners, anything less than a recovery in the amount of the value of the property (up to the policy limits) will not constitute full indemnity for the loss.

▇▇▇▇▇ ¶19 It might be objected that allowing a fractional interest holder to recover the full value of the fee interests under an insurance contract implicates the public policy concerns underlying the insurable interest requirement. In response we would underscore that the insuring cotenant acts as an agent for the other co-owners in acquiring insurance on the premises and any recovery is held in trust by the insuring cotenant for the benefit of the other joint owners. An agent is a fiduciary with respect to any matter in the scope of the agency relationship.[46] An agent receiving money belonging to the principal holds the money in trust for the principal's benefit.[47] Should the insuring co-

---

44. Agency has been defined as "a contract by which one person, with greater or less discretionary powers, undertakes to represent another in certain business relations." FRANCIS WHARTON, A COMMENTARY ON THE LAW OF AGENCY AND AGENTS § 1 at 1(1876). *See also* RESTATEMENT OF THE LAW (SECOND) OF AGENCY § 1, which defines agency as "the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." For a history of common-law agency, *see* B.S. MARKESINIS and R.J.C. MUNDAY, AN OUTLINE OF THE LAW OF AGENCY pp. 1–225 (Butterworths 1992).

45. The certification order points out that three of the six cotenants in this case are minors. Minors have statutory limitations on their capacity to enter into insurance contracts and they are barred by statute from appointing agents. *See* the provisions of 36 O.S.2001 § 3606 (insurance contracts by minors) and 15 O.S.2001 § 17 (appointment of agents by minors), respectively. No person in Oklahoma, including a parent, has control over the property of a child unless appointed by the court. *Wagnon v. Carter*, 1975 OK 9, ¶47, 539 P.2d 735, 740; *Jones v. Goldsberry*, 1926 OK 523, ¶4, 118 Okla. 219, 247 P. 60, 61. Yet parents are the natural guardians of their children. *Guardianship of Hight*, 1944 OK 143, ¶16, 194 Okla. 214, 148 P.2d 475, 480. As their children's natural guardians, parents ordinarily have the minimal right to their custody, control, and care. It is their duty to support and educate their children. 10 O.S.2001 § 4. They are liable to third persons for necessities furnished their children when they neglect to provide the children with necessities. 10 O.S.2001 § 13. The right of parents to the care, custody, companionship and management of their child is a fundamental right protected by the federal and state constitutions. *McDonald v. Wrigley*, 1994 OK 25, ¶9, 870 P.2d 777, 781. The relationship is in the nature of a trust, subject to control and regulation by the state. *Carignan v. State*, 1970 OK 82, ¶10, 469 P.2d 656, 659. Implicit in a parent's duty to care for a child is the means to carry out that duty, including the authority to take reasonable measures to protect the child's property interests. This may include obtaining insurance on property the child owns. When the parent and child are cotenants and the parent insures his (or her) own interest in the co-owned premises or authorizes another cotenant to procure insurance to protect the parent's interest in the property, the parent may also agree on behalf of the child that any insurance obtained protect the child's interest as well. Whether the parent has done so is a question of fact.

46. RESTATEMENT OF THE LAW (SECOND) OF AGENCY § 13.

47. A fiduciary stands in the status of trustee in relation to his (or her) principal. *Panama Processes, S.A. v. Cities Service Co.*, 1990 OK 66, ¶35, 796 P.2d 276, 290.

tenant fail to account to the other joint owners for their share of the proceeds, an action to impress the funds with a constructive trust would be available.[48] The insuring cotenant can have no motivation for wagering on the property's loss and cannot profit by its destruction where the insurer is required to pay the coverage limits, but each cotenant is legally entitled to only his share of the proceeds.[49]

¶ 20 The ordinary person purchasing insurance cannot be expected to understand a term of art such as insurable interest in a policy of insurance. All the insured knows is that he (or she) has paid money to secure protection for the insured property and in case it is destroyed the insurer will cover the loss. The policy of insurance in this case states that it covers "your [the insured's] dwelling." On the eleventh page of the policy, fifth among a list of fifteen conditions is the insurable interest limitation. The insurer never asked the insured about her legal interest in the insured property. The policy limits and the premium paid by this insured clearly demonstrate her intent that more than her bare legal interest be insured. An insurer cannot lead an unsophisticated insured into believing that protection of the family home has been procured and then after the occurrence of the insured event deny full coverage.[50]

¶ 21 Finally, it is immaterial to the risk assumed by the insurer whether this plaintiff was acting as the agent of the joint owners or whether she was the property's sole owner. The insurer believed it was entering into a contract of indemnity for the full value of the home up to the coverage limits. Its obligations are not increased by the actual status of the legal title to the insured premises. The risk it assumed is the risk it incurred.[51]

## V

## A COTENANT IN POSSESSION, BEING LEGALLY LIABLE TO THE OTHER JOINT OWNERS FOR DAMAGE TO OR DESTRUCTION OF THE COMMON PROPERTY, HAS AN INSURABLE INTEREST TO THE EXTENT OF HIS (OR HER) POTENTIAL LEGAL LIABILITY

¶ 22 Plaintiff also urges us to instruct the certifying court that she has an insurable interest in the whole dwelling by virtue of her use and occupancy of it as her residence. We need not decide whether bare possession would suffice to permit a cotenant in possession of a dwelling to insure it for its full value. This is so because we recognize the traditional common-law rule that whenever one person is by circumstances placed in such a position with regard to another, that, if he (or she) did not use ordinary care and skill in his (or her) own conduct, he (or she) would cause danger of injury to the person or property of the other, a duty arises to use ordinary care and skill to avoid such danger.[52] A cotenant who occupies and uses the common property falls within this rule. He (or she) is obligated to use ordinary care in the use of the common property and stands

**48.** An implied trust or constructive trust arises by operation of law. It is imposed against an individual when the individual obtains a legal right to property through fraudulent, abusive means or through a method which violates equity and good conscience. *Matter of Estate of Ingram*, 1994 OK 51, ¶ 19, 874 P.2d 1282, 1287. A constructive trust is one of equity's most powerful fraud-rectifying devices. The primary reason for imposing a constructive trust is to avoid unjust enrichment. *Easterling v. Ferris*, 1982 OK 99, ¶ 10, 651 P.2d 677, 680.

**49.** The certification order states that plaintiff's adult son, John, not only agreed with plaintiff that she would procure the insurance on the property but also that she alone would collect the proceeds in the event of an insured loss. Whether such an agreement is contrary to public policy and whether it can bind the interests of the minor cotenants even if valid between the adults are issues not presented by, nor fairly comprised in, the question certified to us, which addresses only the relative rights of the insurer and the insured.

**50.** *See Collins v. Quincy Mutual Fire Ins. Co.*, 297 N.C. 680, 256 S.E.2d 718, 721 (1979); Convis, *supra* note 27 at 622–23.

**51.** *Collins, supra.*

**52.** *Iglehart v. Bd. of County Comm'rs of Rogers County*, 2002 OK 76, ¶ 10, 60 P.3d 497, 502; *Heaven v. Pender*, 11 Q.B.D. 503, 509, 1883 WL 19069.

liable to the other joint tenants for damage to or destruction of the property. A cotenant in possession may hence become subject to pecuniary loss in tort if the dwelling is damaged or destroyed. This legal liability provides an insurable interest for purposes of property insurance.[53]

¶ 23 The separate writing of the justice who partially concurs in today's pronouncement suggests that our answer to the certified question establishes as a matter of law that a cotenant in possession has an insurable interest in the common property by virtue of the cotenancy relationship. This is a misstatement of our holding, which rests on

the potential liability of a cotenant in possession to the other cotenants for damage to or destruction of the common property and not on a status-based duty to insure the common property for the benefit of the other joint owners.[54]

¶ 24 The objection could be raised that a cotenant who could recover all the insurance proceeds upon a total loss of the common property might be tempted to destroy the property and then either keep the proceeds or use them to rebuild, excluding the former cotenants from ownership of the new premises. Cotenancy principles preclude this result. Just as the acquisition of an adverse

---

53. Keeton, *supra* note 16 at 111.

54. None of the cases cited in the separate writing *holds* that the duty of a cotenant in possession to preserve the common property includes an affirmative duty to insure. In *Estate of Ray*, 7 Ill. App.3d 433, 287 N.E.2d 144 (1972), the decedent was the owner of a one-third interest in a farm as a tenant in common with his six adult children who each owned a one-ninth interest. The deceased father had lived alone on the farm, had operated the farming business, and had purchased homeowner's insurance on the property out of the profits of the farming operation. The farmhouse was destroyed by fire while the father was still alive but in a nursing home and the question before the court was whether the father was a constructive trustee of the insurance proceeds for the benefit of his six children. The court held that the deceased was a constructive trustee and that the proceeds of the insurance applicable to the ownership of the six children must be turned over to the administrator of decedent's estate. The court noted the generally accepted rule that a tenant in common in possession of property and in receipt of all profits from the property has a duty to be reasonably prudent in maintaining and preserving the property. The court went on to say that this duty "would extend to keeping the property insured for the benefit of all owners" because "absent such duty the co-tenant in possession could use the avails of the commonly owned property to obtain insurance to the extent of its full value in his name alone, and upon the loss by fire of such property retain as his own the entire proceeds of the policy." *Id.* at 149. The import of the court's holding is not that the status of cotenant *requires* a co-tenant in possession to acquire insurance on the property, but only that if he does insure the property out of the property's "avails" the court will deem the proceeds to belong to all cotenants.

In *Baird v. Moore*, 50 N.J.Super. 156, 141 A.2d 324 (1958), a mother assigned a leasehold estate in her residence to her son and daughter as tenants in common. The son lived there for some years but then voluntarily left to live else-

where. The daughter remained, cared for the mother, and paid taxes, insurance premiums, and necessary repairs on the property. After the death of the mother and son, the daughter brought an action against the son's administratrix for partition of the leasehold estate and for an accounting. The trial court disallowed, in assessing defendant's liability in the accounting for maintenance expenses, any contribution by defendant for the period after the son moved out of the common household. On appeal, the court held that the deceased son's estate was chargeable in the accounting for his ratable share of maintenance expenses, including insurance premiums, even after he moved out of the house. The case does not stand for the proposition that a cotenant in possession is *required* to obtain insurance on the common property by virtue of his status as cotenant in possession. Rather, the case considers the principles controlling the right of a cotenant to use property without charge or to be subject to a charge when seeking contribution from other cotenants for maintenance expenses.

*Mastbaum v. Mastbaum*, 126 N.J. Eq. 366, 9 A.2d 51 (Ch.1939) involved four cotenants of a two-family house. Two of the cotenants occupied the upstairs apartment. The downstairs apartment was rented. The co-tenants out of possession sought a partition and accounting, including the rental value of the apartment occupied by the cotenants in possession. Defendant cotenants in possession presented an accounting of the rent collected from the downstairs apartment and ask to be discharged because they spent the rental income on repairs, insurance, taxes, etc. In defining the principles governing an accounting in a cotenancy situation, the court recited that a tenant in common who is in sole possession of the common property is under a duty to his co-tenants to preserve the property by making needful, ordinary repairs, and paying taxes, mortgage interest and insurance premiums. The court did not hold that the cotenancy relationship imposed an affirmative duty on a cotenant in possession to insure the property.

title inures to the benefit of other joint owners,[55] so, too, must the recovery of insurance proceeds. The insuring cotenant in possession must account to the other joint owners for their share of the insurance proceeds and a suit to impress a constructive trust on the proceeds would be available to the other cotenants if the insuring cotenant fails to make the required accounting.

¶ 25 **CERTIFIED QUESTION ANSWERED**

¶ 26 WATT, C.J., and HODGES, LAVENDER, SUMMERS and WINCHESTER, JJ., concur.

¶ 27 HARGRAVE and KAUGER, JJ., concur in result.

¶ 28 BOUDREAU, J., concurs in part and dissents in part.

BOUDREAU, J., concurring in part and dissenting in part.

¶ 1 I agree with the majority that a tenant in common, in possession of the common property, has an insurable interest to the extent of his or her potential legal liability for the loss or destruction of the property. However, I would base this holding on the status based duty of the cotenant in possession to preserve the common property for the benefit of the other cotenants, and not on a duty derived from general negligence principles.[1]

¶ 2 The majority opinion recognizes that each tenant in common has a mutual and reciprocal interest in the safety and preservation of the common property. Beyond

that, a cotenant *in sole possession* has a duty to preserve the common property for the benefit of the other cotenants. *See, e.g., Gearhart v. Gearhart*, 213 S.W. 31, 33 (Mo. 1919) (a cotenant in sole possession and enjoyment of the common property is deemed to have undertaken the discharge of certain duties to his cotenants, such as preserving the property); *Caffey v. Caffey*, 274 Ark. 335, 625 S.W.2d 444, 445 (1981); *Bailey v. Parker*, 492 So.2d 1175, 1177 (Fla.App.1986); *In re Estate of Ray*, 7 Ill.App.3d 433, 287 N.E.2d 144, 149 (1972); *Ellis v. Snyder*, 83 Kan. 638, 112 P. 594, 595 (1911); *Smither v. Betts*, 264 S.W.2d 255, 257 (Ky.App.1954); *Baird v. Moore*, 50 N.J.Super. 156, 141 A.2d 324, 327 (1958); *Mastbaum v. Mastbaum*, 126 N.J. Eq. 366, 9 A.2d 51, 55 (Ch.1939); *Clute v. Clute*, 197 N.Y. 439, 90 N.E. 988, 990 (1910).[2]

¶ 3 Insurable interest is defined as "any actual, lawful, and substantial economic interest in the safety or preservation of the subject of the insurance free from loss, destruction or pecuniary damage or impairment." 36 O.S.2001, § 3605(B). Because a cotenant in sole possession of the common property has a legal duty to preserve the common property for the benefit of the other cotenants, she is potentially liable to her cotenants for loss, destruction or impairment of the property. Accordingly, she has an actual, lawful, and substantial economic interest in the safety or preservation of the common property that is the subject of the insurance. This economic interest allows a cotenant in possession of the entire common property to claim an insurable interest in the value of the entire common property.

---

**55.** *See* cases cited *supra* note 41.

**1.** The insurable interest of a cotenant in possession must be based on the status-based duty to preserve the property for the benefit of the other joint owners, and not on the general duty to exercise ordinary care so as not to injure the person or property of another. The following example illustrates why the difference is important. A lessee under a three-month rental agreement undoubtedly has a duty to exercise ordinary care not to damage the leased premises and is subject to potential liability to the lessor for failure to do so. However, I do not believe the majority would conclude that the lessee has an insurable interest in the leased premised he or she occupies.

**2.** Most jurisdictions state that a cotenant in possession has a duty to preserve the property by making needful, ordinary repairs, payment of taxes and other annually maturing liens. Some jurisdictions have gone so far as to say this duty includes the responsibility to keep the property insured. *See, e.g., In re Estate of Ray*, 7 Ill. App.3d 433, 287 N.E.2d 144, 149 (1972); *Baird v. Moore*, 50 N.J.Super. 156, 141 A.2d 324, 327 (1958); *Mastbaum v. Mastbaum*, 126 N.J. Eq. 366, 9 A.2d 51, 55 (Ch.1939). However, the certified question does not require us to hold that the cotenant in possession has a duty to keep the property insured or to settle legal issues regarding compelled contribution between cotenants.

¶ 4 Allowing a cotenant in possession to recover the full value of the property under an insurance contract does not undermine the public policy concerns underlying the insurable interest requirement. In the event of a loss, the cotenant in possession will not be able to retain the entire proceeds of the policy. Tenants in common each stand in a relation of mutual trust and confidence to each other. *Rex Oil Refining, Inc. v. Shirvan,* 1967 OK 127, 443 P.2d 82, 87. Where one cotenant comes into possession of funds belonging to other cotenants, she becomes a trustee of such funds and stands in a fiduciary relationship to the other cotenants. *Ludey v. Pure Oil Co.,* 1931 OK 527, 157 Okla. 1, 11 P.2d 102, 104. A constructive trust would arise where there is a breach of this fiduciary relationship. *Renegar v. Bruning,* 1942 OK 99, 190 Okla. 340, 123 P.2d 686, 687.

¶ 5 I do not think it is necessary for us to decide whether a cotenant in possession who has insured the common property for its full value may recover more than the value of her fractional interest in the property when she acts as the managing agent for the joint owners.[3] In *Jones v. University of Central Oklahoma,* 1995 OK 138, 910 P.2d 987, 989, we cautioned that we would not presume any facts outside those offered by the certification order. The certification order contained no facts indicating plaintiff was acting as an agent of the other fractional owners, nor did the plaintiff allege or tender evidentiary materials establishing such an agreement between herself and the remaining cotenants.

---

3. In Part V, the majority concludes as a matter of law that plaintiff has an insurable interest in the entire property simply by virtue of her status as a cotenant in sole possession of the common property. This makes it unnecessary to determine whether the plaintiff was the "managing agent" of her other cotenants.