OSCN Found Document:McGINNITY v. KIRK

 
 
 

 
 
 
 
 
 
 
 

 


 
 
 
 
 
 


 
 OSCN navigation


 
 
 Home

 
 Courts

 
 
 Court Dockets
 

 
 Legal Research

 
 Calendar

 
 Help
 
 





 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 
 
 

 
 
 
 McGINNITY v. KIRK
2015 OK 73
Case Number: 110212
Decided: 11/03/2015
THE SUPREME COURT OF THE STATE OF OKLAHOMA
Cite as: 2015 OK 73, __ P.3d __

 
NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL. 

THOMAS L. McGINNITY and CLAUDIA McGINNITY, husband and wife Plaintiffs/Counter-Defendants/Appellees,
v.
PEGGY J. KIRK, a/k/a PEGGY JEAN KIRK, JAMES MERLE KIRK, and MARY KOMONCE, Defendants/Counter-Plaintiffs/Appellants
and
MARY KOMONCE, Defendant.

CERTIORARI TO THE OKLAHOMA COURT OF CIVIL APPEALS, DIVISION NO. I

¶0 The McGinnitys brought proceedings for forcible entry and detainer and to foreclose on real property and the Kirks filed claims against the McGinnitys based on allegations of abuse of process and breach of contract. The Honorable B. David Gambill, Associate District Judge, Osage County, granted a judgment against the Kirks. The Kirks appealed and the trial court's judgment was affirmed by the Court of Civil Appeals, Division I. The Kirks sought certiorari in this Court to review the opinion of the Court of Civil Appeals. We hold the value of the property exceeded the amount due on the mortgage and no waste was present, but the District Court's finding that the Kirks breached the contract for deed is not against the clear weight of the evidence on the McGinnitys' claims of failure to maintain insurance and the property. We affirm the trial court's judgment in favor of the McGinnitys and against the Kirks on their counterclaims. We grant an appeal-related attorney's fees and costs.

CERTIORARI PREVIOUSLY GRANTED; OPINION OF THE COURT OF
CIVIL APPEALS VACATED; JUDGMENT OF THE DISTRICT COURT
AFFIRMED; ATTORNEY'S FEES AND COSTS GRANTED

Gertner F. Drummond, Harvey C. Grauberger, Drummond Law, PLLC, Tulsa, Oklahoma, for Plaintiffs/Counter-Defendants/Appellees.
Gregory G. Meier, Tulsa, Oklahoma, for Defendants/Counter-Plaintiffs/Appellants.

EDMONDSON, J.

¶1 This is an appeal from a judgment entered after a non-jury trial in a mortgage foreclosure proceeding. We hold the value of the property exceeded the amount due on the mortgage and no waste was present, but the district court's finding that the Kirks breached the contract for deed is not against the clear weight of the evidence on the McGinnitys' claims of failure to maintain insurance and failure to maintain the property. We affirm the trial court's judgment in favor of the McGinnitys on the Kirks' claim for abuse of process.

¶2 The Kirks purchased a house in Osage County from Buel and Peggy Neece in 1987. The house was built in 1883. This house was located on approximately one-half acre within a 145-acre area owned by the Neeces. The Kirks signed a Contract for Deed that required monthly payments of $400 to the Neeces. In 1998, the Neeces sold their property to Thomas and Claudia McGinnity and assigned the Contract for Deed to the McGinnitys.

¶3 The legal proceeding started as a forcible entry and detainer proceeding brought by the McGinnitys against the Kirks and a separate foreclosure proceeding. The two proceedings were consolidated in the trial court. A trial court decision was appealed and after a decision by the Court of Civil Appeals a non-jury trial was held on remand. The present proceeding is an appeal from the post-remand non-jury trial.

¶4 The McGinnitys brought claims against the Kirks based upon breach of contract and a foreclosure of the contract for deed. They asserted that the contract for deed was breached by the Kirks due to (1) failing to keep the property insured for full replacement value, (2) conveying an interest in the property to Mary Komonce[1] without express written consent, (3) committing and permitting waste of the real property, (4) failing to keep the buildings and improvements in good repair, and (5) failing to begin immediate restoration. The McGinnitys sought foreclosure as their remedy, with attorney's fees and costs, but did not seek damages. The Kirks asserted estoppel, waiver, duress, accord and satisfaction, laches and claims based upon breach of contract and abuse of process. The parties agreed that the unpaid amount required by the contract for deed was $27,406.27.

¶5 The trial court denied the McGinnitys' request for judgment at the conclusion of their case in chief. Ultimately, the trial court determined that the Kirks breached the terms of the contract for deed. The trial court granted foreclosure on the real property in rem, quieted title in and to the McGinnitys against any claim of the Kirks and Komonce. The trial court reserved the issue of attorney's fees and costs to be presented to the trial court by a separate motion. The trial court found in favor of the McGinnitys on all of the Kirks' defenses and counterclaims.

¶6 The Kirks appealed and the judgment of the trial court was affirmed by the Court of Civil Appeals. The Kirks petitioned this Court for certiorari. They argued on certiorari that (1) no waste of the property occurred and the evidence was insufficient to show that the value of the property was less than the amount owed on the contract for deed; (2) insurance coverage was maintained on the property; (3) the conveyance to Komonce was a legal nullity, no reason for foreclosure, and the McGinnitys' objection to the conveyance was barred by limitations;[2] and (4) the Court of Appeals erroneously agreed with the trial court that the Kirks' abuse of process claim was barred by limitations. We granted certiorari.

¶7 The Kirks appealed a judgment foreclosing a mortgage. By 16 O.S. 2011 § 11A, contracts for deed "made for the purpose of establishing an immediate and continuing right of possession ... shall to that extent be deemed and held mortgages . . . and shall be subject to the same rules of foreclosure and to the same regulations, restraints and forms as are prescribed in relation to mortgages."[3] When the contract for deed was properly executed, equitable title to the real property passed to the Kirks as buyers, the Neeces as sellers retained only the bare legal title, and the interest retained by the Neeces was equivalent to a mortgage for the purpose of guaranteeing payment due under the contract.[4] The effect of the assignment of the contract for deed to the McGinnitys was an assignment of a mortgage for the purpose of foreclosure proceedings.

¶8 In a trial adjudicating a claim to foreclose a mortgage, the trial court acted as a court of equity as to the foreclosure.[5] We have stated that: "In a case of equitable cognizance, a judgment will be sustained on appeal unless it is found to be against the clear weight of the evidence or is contrary to law or established principles of equity. In making such determination on appeal, this Court must examine the record and weigh the evidence."[6]

I. No Breach Based Upon Waste

¶9 Generally, "waste" occurs when a lawful possessor of real property causes an unreasonable injury to the estates held by others in that property.[7] Historically, and depending on the jurisdiction where the property was located, a mortgagor committing waste of the mortgaged property was subject to a mortgagee seeking the equitable remedy of injunction[8] as well as an action in tort for damages.[9] In the present proceeding, the contract expressly prohibited "waste," and made waste a contract-specified ground for breach of the agreement and a reason for transferring possession to the Neeces and their assigns. In the district court, the McGinnitys alleged breach of contract due to waste and sought foreclosure.

¶10 The Kirks rely upon our opinion in Phillips v. Hill for the proposition in their appellate brief that waste does not occur, as a matter of law, when the party committing the waste will become the owner of the property.[10] They state that because of their willingness to continue the monthly payments and become owners of the property, waste did not occur as a matter of law. They state that "the Phillips case . . . is outcome determinative as a matter of law in this appeal."[11] Their reading of Phillips is incorrect.

¶11 In Phillips v. Hill, a distinction was drawn between lessees who purchase property and lessees who do not, and we stated that "the contract of the parties, the facts and circumstances surrounding the breach of the lease and the exercise of the option to purchase are controlling."[12] We explained that the lessors/sellers of the property suffered no economic damage because the buyer was "ready, willing and able to exercise his option to purchase at any time most advantageous to plaintiffs [sellers-lessors], and the sellers would receive "the entire purchase price as specified in the option and all rentals" and sellers "will receive all sums due under the contract."[13] In Phillips the lessee/buyer pled that the sellers "could accelerate the provisions of the option to purchase," and the lessee "tendered the balance of the rental payments owing for the remainder of the lease term and the full agreed purchase price."[14] The appellate adjudication in Phillips did not turn on the mere status of a lessee as a potential owner of the property, but on a lessee seeking to become an owner by tendering the whole sum due on the contract and making the lessor economically whole, as defined by their agreement, at the time the lessor sought legal relief.

¶12 Our reading of Phillips where tendering payment of the complete contractual debt acts to prevent foreclosure is consistent with (1) opinions recognizing the doctrine prohibiting clogs on a mortgagor's equitable right of redemption,[15] (2) opinions explaining a right of redemption, a mortgagor's right to save an estate from foreclosure by payment of the full mortgage debt[16] after default for any reason and prior to confirmation of the foreclosure sale,[17] (3) the statutory (16 O.S. § 11A) classification of a contract for deed as a mortgage for the purpose of foreclosure, and (4) public policy recognizing the contractual rights of mortgagees such as that expressed in Federal Land Bank of Wichita v. Story.[18]

¶13 On the other hand, the Kirks' understanding of Phillips v. Hill, and the legal rule they champion, is inconsistent with public policy recognized by this Court in Federal Land Bank of Wichita v. Story. In that case, we affirmed a district court's adjudication that the Oklahoma Mortgage Foreclosure Moratorium Act (62 O.S.Supp. 1986 §§ 492, 493) violated the Federal and State Constitutional Contracts Clauses,[19] and Okla. Const. Art. 2 § 6.[20] We stated that the Act was a debtor relief law that prohibited and delayed certain foreclosures involving pre-existing mortgages, and also failed to grant trial courts the power to prevent waste and protect a mortgagee's contractual rights during the period of statute-required delay in the foreclosure process.[21]

¶14 A mortgagee's right to prevent waste causing detriment to the security has long been recognized by courts.[22] The Kirks' reading of Phillips would have us read contracts for deed of real property as preventing enforcement of an express clause in a contract stating that a buyer must prevent waste. We decline to adopt their reading of Phillips. The Kirks' contractual status to become owners and their desire to continue the required monthly payments are not sufficient to relieve them from their contract-specified duty to prevent waste.

 

¶15 Application of Phillips v. Hill, supra, is dependent upon the record showing that the amount due on the contract was tendered by the Kirks. In their appellate brief they state a stipulation of the parties that $27,406.27 remained for the Kirks to pay when the legal proceeding was commenced. The Kirks do not rely upon payment of the total amount during the litigation,[23] but argue because the McGinnitys declined to accept the monthly payments and filed "a bogus foreclosure action," they "should be awarded judgment voiding any obligation to pay the $27,406.27 on the Contract for Deed...." Application of Phillips v. Hill, supra, does not help the Kirks in this proceeding.

¶16 In a 1948 opinion, we explained that a foreclosure based upon waste must be based upon evidence in the record showing that the alleged waste made the mortgage security inadequate.[24] One appraisal of the property at trial was $42,000 using a "sales approach," another $44,748 using a "cost approach," and with a $200,000 "cost to cure the waste, the depreciation and injury to the property" resulting in a potential value of "$264,000 and some change." Three appraisers filed with the court an appraised value of $36,000 in July of 2005. The trial court later confirmed $51,666.67 bid by the McGinnitys as the best bid at a sheriff's sale. The evidence showed that the mortgage security was adequate, and no waste was shown.

II. Breach Based Upon Failure to Maintain Insurance

¶17 The contract for deed states that: "The second party [Kirks] shall keep all buildings on the said premises insured for their full replacement value for the benefit of the first party [Neeces/McGinnitys] at the second parties own cost and expense and shall deliver said insurance policies into the possession of the first party." When the McGinnitys commenced the proceedings in 2004, they alleged the contract for deed had been breached and pled the Kirks were required to provide them with then current insurance policies.

¶18 After the first appeal, the amended pretrial conference order states the McGinnitys allege that breach of the contract had occurred by the Kirks' failure to keep the property insured.[25] The McGinnitys argued that (1) the property was uninsurable when the notice of insurance non-renewal was sent to the Kirks, (2) the Kirks' interest in the property continued until the confirmation of the sheriff's sale, many months after they moved from the residence, and (3) a breach of the contract for deed occurred by their failure to maintain insurance on the property during the foreclosure proceeding.

¶19 An insurance agent testified that in late 2003 and in 2004, he noticed that the property "kept deteriorating" and "there would be more stuff parked around the driveway where it was inaccessible to get to the house." In 2004 the property was "sure on the list of the uninsurable properties I had coming up." The agent viewed the property "many times," took photos of the property, and sent them to the home office where a determination of non-renewal was made. He stated the policy was non-renewed after an inspection of the property showed "junk cars that were all around the residence, the fence that was ill repair . . . it would have been hard to get the fire equipment to the house, trees that were overgrown and grass that had not been mowed...."

¶20 On May 5, 2005, Oklahoma Farm Bureau Mutual Insurance Company sent a letter to Peggy Kirk and notified her that the insurance policy would not be renewed and would expire on June 21, 2005. During the litigation the agent sent a letter to the McGinnitys stating that insurance would not issue because "significant changes made to the dwelling" were necessary, including "taking down the carport, removing dead trees and removing old rotten fence" that "were a fire and liability hazard." He told the McGinnitys that trees hanging over the house could fall on the house and had to be removed before a policy would issue.

¶21 The agent testified "there were vines growing up and over the house . . . just overall condition of the house was not being maintained." He said while he could not see or examine the second-story roof, "on the back side of the house where there's an addition or an add-on, the roof was in terrible repair there where some air conditioning vents or something was coming into the house. There's pretty bad wood rot and ill repair on that side of the house." He testified that non-renewal was not based upon the condition of the structure itself, but because of the trees, fences, grass, and cars surrounding the structure.

¶22 James Kirk testified that neither the insurance agent or any other person connected with the insurance carrier told him that he needed to trim trees in order to renew the insurance. Similarly, no one told him that he needed to remove cars or the fencing on the property. When asked on direct examination what steps he took to obtain insurance after receiving notice from the carrier, James Kirk said, "Well, we were ordered by the judge to vacate." Then when again asked what steps he took to insure the property between the May 5th notice and the judge's order to post bond or vacate the property, he said "We weren't contacted to do it, to keep insurance with him [the insurance agent] at that time." When asked on cross-examination what attempts he made to get insurance after the notice of non-renewal, Kirk said he found one insurance company to insure the property. When asked if insurance was obtained he said, "Well. We were moving out a month later, so there was no reason to get, insure it."[26] There is no allegation that the Kirks tendered payment to the McGinnitys for payment of insurance premiums.

¶23 The Kirks argue on appeal that they did not fail to maintain insurance coverage. No authority is cited in their brief and their argument treats the issue as one of fact and not law. Their argument on certiorari is the same. They state they were never made aware of the reason of the insurance non-renewal. James Kirk's testimony is that he decided not to insure the property because he and his wife were moving from the property.

¶24 Generally, a party bringing an action on a contract is not limited at trial to those claims in existence at the time the action was originally brought. For example, it is upon a final judgment on an action that the parties' rights and obligations cease as contractual rights, becoming merged into a final judgment,[27] and then the parties have the status as judgment debtor and creditor with the judgment enforced by the usual means.[28] Claims based upon contractual rights and obligations may be added for adjudication after commencement of an action and prior to a final adjudication, and this rule is shown by (1) 12 O.S. § 2015 (B) which allows amendments at trial to conform to the evidence,[29] and (2) amendments upon remand to the trial court after an appeal.[30] This concept is nothing new in foreclosure jurisprudence where a related principle is that "In a proper case, a supplemental bill or complaint may be filed as where the action is brought on default in payment of one installment of interest or principal of the mortgage debt and others mature pending the suit . . . or where a breach of other condition occurs after suit brought . . . or where the plaintiff becomes entitled to further or different relief."[31]

¶25 The contract for deed requires the Kirks to "keep" or maintain insurance for the full replacement value of the property. A contractual duty in a contract for deed to keep or maintain insurance is a continuing obligation or continuing covenant.[32] The contract for deed does not expressly condition the Kirks' obligation to maintain insurance upon their continued physical possession of the property.[33]

 

¶26 When the contract for deed was executed and the Kirks took possession in 1987, an equitable title to the real property passed to them, and the Neeces and their assigns, the McGinnitys, retained a legal title,[34] and the parties' obligations and rights came to be governed by the existing and enforceable contract between them. We have explained that "there is an insurable interest in property if the insured would gain some economic advantage by its continued existence or would suffer some economic detriment in case of its loss or destruction."[35] A mortgagor has an insurable interest that continues beyond default and the beginning of a foreclosure proceeding and after the mortgage foreclosure sale, and during the period of redemption, while the right in equity to redeem the mortgaged premises exists.[36] The Kirks possessed an equitable title and an insurable interest that continued during the foreclosure proceeding in 2005.

¶27 The 2005 journal entry of judgment was in a case that had consolidated two proceedings, a forcible entry and detainer proceeding and a second case seeking foreclosure based upon alleged breach of contract. Judgment was awarded upon the Kirks' default and the McGinnitys awarded possession based upon (1) forcible entry and detainer[37] and waste, and (2) specific performance for contract-based right of physical possession upon the Kirks' breach. The court concluded an unlawful lot-split occurred by the Kirks, granted the McGinnitys possession of the property, quieted title in them, rescinded the contract for deed and declared it void, granted foreclosure and ordered a sale of the property.[38]

¶28 Four months after the journal entry of judgment was filed, a hearing was held on the Kirks' motion to stay execution of the judgment. The trial court denied the motion and ordered that the Kirks either post bond within thirty days in the amount of $40,000 in accordance with 12 O.S. § 990.4(B)(3) or vacate the property within thirty days. The Kirks declined to post bond and vacated the property.

 

¶29 The McGinnitys entered the property pursuant to a judgment that was appealed and then no execution was stayed or appeal bond posted. The McGinnitys cleaned the property and made changes to property for the purpose of obtaining insurance. The following year Claudia McGinnity bought the property for $24,001.00 at a sheriff's sale. The Kirks objected to sale and alleged the property had a value of $77,500. At the hearing in 2006 to confirm the sale, the McGinnitys offered to increase their bid to $51,666.67. The trial court concluded that the McGinnitys accepted the value placed on the property by the Kirks, the amount of $51,666.67 satisfied a requirement that the successful bid be at least 2/3 of the valuation,[39] and confirmed the sale for $51,666.67. The order confirming the sale was filed in 2006.[40]

¶30 Contemporaneous to these proceedings the Court of Civil Appeals, in appellate case No. 102,126, affirmed the judgment against Komonce. The appellate court also determined that the trial court should have granted the Kirks leave to file an answer out of time, and the court reversed the judgment against them with express instructions for the trial court to allow the Kirks to further plead by filing an answer. Mandate issued in June 2007 after the sale was confirmed in April 2006. The parties participated in a jury trial in October 2010 resulting in a mistrial and then a non-jury trial that occurred in October 2011, resulting in a judgment foreclosing the Kirks' interest.

¶31 In 2005 when the insurance was not renewed, the Kirks' and the McGinnitys' rights to possess the property during legal proceedings based upon a breach of the contract for deed were governed by 16 O.S. 2011 § 11A: contracts for deed "made for the purpose of establishing an immediate and continuing right of possession ... shall to that extent be deemed and held mortgages." Because the contract for deed is considered as a mortgage for the purpose of possession, the right of the seller to possess the property based upon a breach of the contract is similar to the general provisions for liens with the right of possession being based upon a foreclosure of the lien: Oklahoma is "a lien theory state" where "Under the lien theory, the mortgagee holds a lien on the property, and the mortgagor retains all incidents of ownership. The mortgagee must take some action before he is entitled to possession of the property."[41] Here the sellers' assigns' (the McGinnitys') right to possess the property arises by a foreclosure proceeding as if the McGinnitys were mortgagees and the Kirks were mortgagors.

¶32 Generally, when a mortgagee takes possession of the mortgaged property, the mortgage-based duties of the mortgagor do not disappear. A mortgagee may take possession prior to foreclosing the interest, but a mortgagee in possession is held to the exercise of such care and diligence as a prudent owner in charge of the premises would exercise.[42] However, a mortgagee in possession procuring insurance does not relieve the mortgagor from a mortgagor's contract-based duty to maintain insurance.

¶33 Courts in various states have recognized when a mortgage requires a mortgagor to maintain insurance the obligation is "as effectual in giving the mortgagee a right to enforce his mortgage as is a breach of the condition to pay an installment of interest or principal."[43] In Farmers & Merchants Bank v. Copple,[44] the Kansas Supreme court found a mortgagee could foreclose a real estate mortgage upon a breach of the mortgagors' covenant to keep the premises insured where mortgagors had not made a timely payment to continue the policy, the policy was in default for nonpayment, and the mortgagee made the insurance payment on the last day of the grace period and sued the mortgagor. The mortgagors argued that insurance "was kept up on the property" and a lapse of insurance had not occurred.[45] The court explained that while no lapse of insurance occurred, the mortgagors failed to perform a contractual duty to maintain insurance. The Kansas opinion is consistent with the long-recognized principle in this state when a mortgagor fails to purchase contractually-required insurance the mortgagee may[46] insure the property at the expense of the mortgagor, and a mortgagee has a lien to the extent of the mortgage indebtedness which includes the additional expense by the mortgagee for the insurance.[47]

¶34 The language in the contract for deed clearly and unambiguously states that the Kirks must keep or maintain insurance. Right of physical possession of property is measured by § 11A which requires treating the contract as a mortgage for the purpose of foreclosure and possession. Treating the contractual obligation to insure the property as a contract-based element necessary for the physical maintenance of the property during the foreclosure is consistent with: (1) a mortgagor's usual contract-based duty to maintain insurance during foreclosure of the mortgagor's interest; (2) the principle that § 11A was part of the parties' contract for deed when the contract was created[48] thus construing the contractual obligation according to the intent of the parties from the contract itself;[49] and (3) the Kirks' argument that they continued to be entitled to possession of the property pursuant to their contract-based right and would thus have continued contract-based obligations.[50] The Kirks' contractual obligation to maintain insurance in 2005 was a continuing duty, and the Kirks breached the contract when they did not maintain insurance on the property during the foreclosure proceeding in 2005.

¶35 We hold that the trial court's judgment that the contract was breached is not contrary to the evidence showing that the Kirks failed to maintain insurance after June 2005, and foreclosure on this ground is not against the clear weight of the evidence.

III. Breach Based Upon Failure to Maintain Property

¶36 The contract for deed has one clause prohibiting waste by the Kirks. The contract also has an additional and separately numbered clause stating the Kirks "shall keep all buildings and improvements of every kind and nature in good repair at his own cost and expense...."

¶37 A contract is to be construed as a whole, giving effect to each of its parts,[51] and not construed so as to make a provision meaningless, superfluous or of no effect.[52] We construe this clause in the contract as requiring the Kirks to maintain the property in good repair independent of the prohibition of waste to a mortgagee's security.

¶38 Claudia McGinnity testified[53] that vines grew on the sides of the house up on the roof and into the chimneys. She said that "many times you would see duct tape repairing the windows, which concerned me about leakage." She identified a door leading into the cellar as "falling apart" with "space between the slats" and "not sealing anything." She identified part of a roof on an addition to the residence as "being held down by cinder blocks." She testified that in her opinion in 1998 the roof looked like it needed to be replaced and in the subsequent years "it only got worse." She identified one photo as showing the roof better with "tar going up the rock on the side of the home." In another photo she identified how the roof and carport appeared to be "pulling away from, somewhat from the structure itself and the limbs and what have you." She identified another photo with debris on the roof. She identified an additional photo with limbs "cluttered on the top of the roof" and stated "there was always limbs and what have you on the top of the roof." She said the wooden fence was "leaving and leaning."

¶39 Her testimony on photos taken of the inside of the residence included her observations that the bathtub was not functional and the drain "you could actually see where it had corroded and that it was not a solid pipe anymore." She testified: "sheetrock has been tore off;" the kitchen "cabinet doors are in various states of disrepair;" "the fronts of drawers are coming off;" water damage resulting in a ceiling "coming down" with the presence of "black mold" in the photo; in the living room a hole in the floor covered by a piece of plywood where the hole was previously a floor vent; water stains and broken sheetrock in an upstairs bedroom; "water stains from many years of leaking, the roof leaking . . . it has deteriorated the sheetrock where it's actually got holes in the sheetrock itself;" stairs on one of two stairwells "not stable at all;" windows that could not be opened and wooden sills in disrepair; and a fireplace that was sealed off. She testified that the Kirks "left approximately 30 cats" and two litters of kittens "in the home and on the property" that had to be taken care of and adopted, and an exterminator was necessary to remove a flea and tick infestation of the premises. She testified that she and her husband hired two men to remove dead trees, debris including barrels and aquariums, vines, fencing, and the carport. She stated the water line"that went across the pasture had several leaks most all of the time that they [the Kirks] lived there" and one could tell when a new leak had occurred because cows would "congregate around that particular place because it was fresh water." She said photos were taken in 2004 and 2005.

¶40 One of the men who was hired to remove the debris stated that he removed 25 or 30 aquariums, and the "big vines hanging everywhere around there" and on the north and south side of the house "we cut down, sprayed them down because they were going into the mortar, pressuring the mortar . . . causing the mortar to crack," and "I thought it was bad enough in the yard, because I had to pick ticks off of me all the time . . . but I went in the house, I got completely covered with fleas. He testified that he had been in the house in 1983 and 1984 prior to when the Kirks took possession, and "it just wasn't the old place," it was "worse" and "bad" with the difference like "night and day," "like turning a switch off." He stated that when an owner three years prior to the Kirks had the property "every fireplace worked" and "I mean it was immaculate." He also testified that a "finished bathroom" used by the former owner was now in disrepair. He testified that the kitchen had become "run-down" in the intervening years. He testified that the sump pump was necessary because several feet of water may collect in the basement "about every time it rains."

¶41 Another witness for the McGinnitys said he lived in the house from 1961 to 1985, and two family members continued to live there after 1985, and then left "sometime between 86 and 89." He testified that the house had been sandblasted and re-mortared in 1972, the kitchen remodeled, and a new roof installed. He stated the bathroom functioned while his family resided in the house. He visited the house after the Kirks left. When commenting on the present kitchen floor he stated that it had become "horrible" because "the original tile is still there, but the only parts that's still there, you're walking through on the subfloor." He identified photos of himself on the outside and inside of the house including one taken in 1986. He identified photos and said water stains inside the house were not present while his family lived in the house.

¶42 A witness who worked for the McGinnitys said that water leaked from the Kirks' water meter and "there was spots in the pasture that never dried up" and the leaks occurred "constantly." He stated that he entered the house after the Kirks left the property "and walked in the front door and stepped over a hole" in the floor. He said he helped remove the Kirks' fence that was "made out of shipping pallets . . . nailed together and secured together and tied up and braced with crap lumber." He stated that inside the house "it looked like there was mold and mildew on the walls where they had been wet." He stated that he helped remove "four dump trucks" that included household trash, old furniture, "like thirty" fish tanks, and carpet infested with fleas. He said the carport was dangerous and "falling down" and he helped remove it. He said that while he had not been on the roof, he could determine that "the whole roof needed to be replaced." He explained that "half of it was covered in vines" and "the part you could see was missing shingles and just a very weathered roof."

¶43 Peggy Kirk testified a water leak did occur and it had been fixed. She said another leak occurred and the McGinnitys prevented her family from fixing the leak on the McGinnitys' property so her husband had to turn off the water when not in use. She was asked why the appraiser for the property had stated that the heat and air system was "not marketable in present design" and she explained that the appraiser did not like central heat and air installed "on any antique house." She stated that she did not have drywall in the house but plaster, and she wanted the plaster to come off the walls. When she was presented with certain photos showing damage to the inside of the house, wood rot, water damage, etc., she stated the photos did not display the condition of the house when her family lived in the house and left the property. She said that when they left the house there were no water leaks and no water damage. Peggy Kirk testified the photos accompanying an appraiser's report introduced as an exhibit for the Kirks were taken in December 2005 and fairly represent the condition of the property.

¶44 Tom McGinnity testified that immediately after the Kirks left he made changes to the property to get the exterior structure insured but not the roof. He answered affirmatively whether the roof was dilapidated and vines were "climbing up the walls and going into the roof and destroying the roof" and if a tree was growing along the foundation of the structure. He testified concerning the cleaning and maintenance he and his wife did after taking possession, e.g., removal of the vines that were overgrowing the house, dead and live trees, wooden fence, and trash. He testified about using the services of a professional exterminator. He gave his opinion that the property was a "shambles" in 1998 and continued to get worse. He said his removal of many sapling trees and shrubs provided access for emergency vehicles.

¶45 James Kirk testified that he and his wife left the property because of the court's order requiring them to post a bond or vacate the property. He stated that he repaired the propane pipes, repaired the floor around a toilet, reset the toilet, repaired a leaking chimney, replaced certain windows, repaired electrical problems, repaired leak on the roof of the "add-on." He stated he replaced a kitchen sink and faucet. He said the bathrooms, heat and air, and electrical were all functional when he and his wife left the property. He said some old electrical wires had been disconnected and made "dead" to prevent a fire hazard. Several receipts for items such as electrical and plumbing parts, paint, gravel, lumber, fence posts, roofing materials, shingles, pipe, and back hoe rental were introduced to show the Kirks' maintenance of the property.

¶46 James Kirk testified that certain photos introduced by the McGinnitys were not accurate representations of the house when he and his wife left. He said that one photo showing concrete blocks on the roof was only for a few months while he repaired a portion of the roof. He said they served to hold down rolled shingle sealed with tar. He said the blocks were not on the roof when he moved. He said no tree limbs punctured the roof while he lived in the house. He identified several photos as not accurately showing the condition of the house when he lived there, e.g., door off its hinges, a "cut-out piece" of linoleum, duct work, insulation and sealant on pipes, etc.

¶47 During questions from the trial judge for clarifying items in the photos, Kirk explained that when he moved in the house one sink would not drain and they never used it. He said cracking plaster in an upstairs bedroom would have been removed when he and his wife remodeled that room. The judge asked him to clarify items in the photos and when the photos were taken. The judge said: "Well, I'm just trying to figure out timing on it. Because one side says one thing and one says another...." After testifying that certain photos were taken on the day he moved out, in response to several questions by the judge concerning information shown by the photos, such as when certain parts of the residence must have been painted, Kirk stated that certain photos were taken in 2003 an 2004. The trial judge reviewed each of the photos and attempted to correlate those taken by the McGinnitys and the Kirks and with the times the photos had been taken by them.

¶48 On cross-examination he said that when he left the house some of the widows were broken, but they were double-paned, and "weren't broken all the way through because I had another piece of glass in with it. So in my view, they weren't broken." When asked about the tree next to the house and foundation, Kirk stated that a landscape company had never said anything about the tree's location and the tree was there when he moved in. When asked about a photo with a split doorjamb, he said he had fixed it when he lived in the house, and while the McGinnitys' photo was "pretty close" the doorjamb when he left the house didn't have "that much gap in it."

¶49 He said a toilet and sink had been removed after they moved in the house and they were "planning on redoing all that and removing part of the pipe that we couldn't get unclogged." He also said Mr. Neece previously denied him permission to remodel by telling him that he could not "redo the kitchen and the bathroom." He said flowers were put in a nonfunctional sink to prevent friends from trying to use it, but the other sink was functional. He also said the photos used for the appraisal introduced by the Kirks were taken in December 2005. December 2005 was several months after the McGinnitys started to work on the property.

¶50 He said he used a piece of plywood with carpet to cover a hole in the floor where he removed a floor furnace. When asked if the hole is an open crawl space to the outside of the house, he answered "yes, to the an exterior wall of the house." (Claudia McGinnity previously testified that there was a hole in this particular exterior wall.) He said the testimony of others concerning gray water coming from the house was water from a kitchen sink which drained into a holding tank and then was siphoned out and placed on the yard.

¶51 David Woolman, a mechanical engineer and project manager, testified for the Kirks. He stated that the house was in disrepair when the Kirks obtained the property in 1987. He stated he had been in the house several times a year since 1987. He said that during the Kirks' residence they had "got the sump pump working," repaired flooring, replaced water pipe, installed gas piping from exterior propane tanks, and "general maintenance and repairs." He stated the toilet worked and the windows, while original and old, were still functional.

¶52 He said he did not notice the roof. He said the Kirks had some issues with a couple of electrical receptacles and "they got them repaired as they could." He said he knew of no problems with the central heating and air conditioning system. He said he noticed no holes in the floors. He testified Peggy Kirk used fish tanks with either fish or flowers in them to decorate the yard. He identified certain photos as accurate representations of the property when the Kirks left, including a photo showing a portion of the roof.

¶53 On cross-examination when shown certain photos of the kitchen, electrical components with dangling wires, holes in the floor, or the photos of water damage on the second floor, he said he did not recall seeing what was in the photos. He explained when he helped the Kirks move he did not go upstairs and he would not have seen those rooms.

¶54 Michael Fox, an electrician, testified about his electrical work on the house. He said the "last time" he was in the house "was about like '93, something like that." He said James Kirk "over a period of time was bringing it all up-to-date." He said everything electrical was operational in the home, but "it's old wiring, and it did have a little problems here and there, and that's what we was fixing, totally rewiring the whole house as they had the money to do it with." He said the old wiring was functional and he changed the circuit breakers.

¶55 One of the McGinnitys' exhibits is an appraisal for $42,500. The appraisal included observations that "the septic system does not work, the plumbing has water leaks which drip in the basement along with sewage backing up in the basement, the wiring is not up to code and is in poor condition." The appraisal noted that floors in various rooms "has damage to them along with interior walls, the central air and heating unit has been added to the house where these units are visible and have not been enclosed in the house, as well as the vent system is exposed through the upstairs on the inside and outside and vents come through windows and upstairs of the house." (The Kirks expressed the view that this appraiser did not understand how a central heat and air system needed to be installed in a house such as theirs, and that all systems were functional when they lived in the house.)

¶56 The appraisal noted settlement in the area of a chimney where different pieces of stone had fallen off. The appraisal noted "the fireplaces do not work, the roof has been patched with black tar, and there are water leaks, dampness can be seen in the house in the bathroom areas, the kitchen areas, basement areas where water is standing, according to information received to the appraiser the water has been turned off at the residence."

¶57 An appraisal introduced by the Kirks for $77,500 states that the main bathroom is partially functional (tub not operable due to nonfunctioning drain), and "the formal living room is the only room in the house with fresh paint. All other surfaces, plaster, drywall, and wood need painting or refinishing." The appraisal noted that the windows "are presently beyond repair for future functionality." The room addition was valued separately and it was noted that "There is wood rot in the roof frame." The appraisal noted newer heating and cooling system and hot water tank, and electrical service that are installed to local codes and functional, but "they are not marketable in their present design." The appraisal noted HVAC ducts and electrical conduit lines that run across walls and baseboards in different rooms and "These items have an adverse effect on marketability." In sum, appraisals submitted by both sides found that marketability was affected by property conditions.

¶58 Where the evidence is conflicting as to the existence of facts showing a failure to keep property in good repair, the judgment of the trial court thereon will not be disturbed where findings necessarily included in the judgment[54] are not against the clear weight of the evidence.[55] We have carefully weighed the evidence herein and, although conflicting, hold that the judgment foreclosing the Kirks' interest based upon a failure to maintain the property is not clearly against the weight of the evidence.

IV. The Kirks' Abuse of Process Claim

¶59 The trial court granted judgment in favor of the McGinnitys on the Kirks' claim based upon abuse of process. The Court of Civil Appeals concluded that the claim was barred by a statute of limitations, and the Kirks challenge that decision on certiorari as well as the trial court's judgment denying their claim.

¶60 The Kirks argue the McGinnitys should not have filed a forcible entry and detainer proceeding while simultaneously filing a foreclosure proceeding. They argue that the McGinnitys should not have used a landlord/tenant remedy when a foreclosure proceeding was the proper remedy for their claims. They claim that abuse of process occurs when the legal process "is being used to obtain something that would not otherwise be obtainable . . . They tried to use their forcible entry case to evict Appellants [Kirks] for [sic] their mortgaged home." The Kirks refer to the McGinnitys using "landlord/tenant remedies what are not available through Oklahoma mortgage foreclosure laws to in essence, evict Appellants."

¶61 It is correct that the contract for deed expressly states that upon default by the Kirks the rights of the Neeces (McGinnitys) "shall include but not be limited to the rights and remedies as provided in the Law of Landlord and Tenant including the right to peacefully retake the premises." However, as we have explained, 16 O.S. § 11A was part of this contract and the McGinnitys were required to foreclose the Kirks' interest based upon the contract as a mortgage. The McGinnitys dismissed their forcible entry and detainer claim prior to trial and after the Kirks filed their post-appeal answer.

¶62 The record on appeal shows that the McGinnitys' Forcible Entry and Detainer Affidavit was filed as a small claims proceeding and their petition for foreclosure filed the same day in the district court. Approximately seven weeks later the two proceedings were consolidated into the foreclosure proceeding, and the journal entry of judgment adjudicating both simultaneously was filed two months after consolidation. The judgment granted possession on the property pursuant to the forcible entry and detainer claim as well as foreclosure and ordering a sale.

¶63 Thomas McGinnity testified that he understood his position as a "mortgage holder." He stated that he understood "in this proceeding" he was "foreclosing a mortgage as a mortgage holder." He answered in the affirmative that he understood that in a mortgage relationship "there's also an owner who has equitable title to the property." He understood that the Kirks were in that role "in this case." Asked what his understanding was in 2004, he knew he was in a mortgage relationship. He stated that he wanted the property vacated and he signed the forcible entry and detainer affidavit that was used in that proceeding in support of him obtaining possession of the property. He stated that his former attorney drafted the forcible entry and detainer affidavit, told him to "sign this," and it was filed by that lawyer the same day with a separate foreclosure proceeding, the two cases later consolidated.

¶64 The allegations of the Kirks do not demonstrate abuse of process, as a matter of law. The elements of an abuse of process claim are (1) the improper use of the court's process (2) primarily for an ulterior or improper purpose (3) with resulting damage to the plaintiff asserting the misuse.[56] Abuse of process occurs when "One who uses a legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it is not designed, is subject to liability to the other for harm caused by the abuse of process." Restatement (Second) of Torts, § 682 (1977). The significance of the word "primarily" is explained by the Restatement.

b. "Primarily." The significance of this word is that there is no action for abuse of process when the process is used for the purpose for which it is intended, but there is an incidental motive of spite or an ulterior purpose of benefit to the defendant. Thus the entirely justified prosecution of another on a criminal charge, does not become abuse of process merely because the instigator dislikes the accused and enjoys doing him harm; nor does the instigation of justified bankruptcy proceedings become abuse of process merely because the instigator hopes to derive benefit from the closing down of the business of a competitor.

For abuse of process to occur there must be use of the process for an immediate purpose other than that for which it was designed and intended. The usual case of abuse of process is one of some form of extortion, using the process to put pressure upon the other to compel him to pay a different debt or to take some other action or refrain from it.

Restatement (Second) of Torts § 682, Comment b.

The notes to § 682 state that "Some act or threat directed to an immediate objective not legitimate in the use of the process is required, and the defendant is not liable if he has done no more than carry the process to its authorized conclusion, even with bad intentions." (Emphasis added.) This view is consistent with a comment made by the Tenth Circuit explaining the elements of abuse of process: "If the action is confined to its regular and legitimate function in relation to the cause of action stated in the complaint there is no abuse, even if the plaintiff had an ulterior motive in bringing the action or if he knowingly brought suit upon an unfounded claim."[57] In Greenberg v. Wolfberg, we explained that there is no abuse of process when the process "is used legitimately to its authorized conclusion."[58]

¶65 The McGinnitys used the forcible entry and detainer process for what that process was intended, for a person to try to gain possession of real property in accordance with that process. An abuse of process claim does not turn on whether the party bringing the claim was successful on the merits of the process that serves as the basis for the abuse of process claim.[59] Similarly, abuse of process does not turn on whether a party is properly invoking the remedy of forcible entry and detainer under the circumstances, but rather whether the remedial process was invoked for a purpose other than what it was designed for. The Kirks' view of the meaning of "improper use of the court's process" would make a lawyer's choice of a particular remedy an abuse-of-process claim if that choice was wrong, based upon the ultimate correctness of the remedy for the particular cause of action. We reject this approach as contrary to both Greenberg v. Wolfberg and § 682.

 

¶66 We need not reach the issue raised on certiorari requiring us to determine the application of a statute of limitations to the Kirks' abuse of process claim. We affirm the judgment in favor of the McGinnitys and against the Kirks on their abuse of process claim.

V. Attorney's Fee and Costs

¶67 The McGinnitys filed a motion for attorney's fees and appeal-related costs. Attorney's fees are awarded in Oklahoma only if authorized by agreement of the parties, by statute, or where the fee is an item of damage caused by the wrong itself rather than an item of expense incurred in attempting to secure redress for the wrong.[60] The contract for deed expressly provides that the Kirks shall pay "a reasonable attorney's fee each time this contract is placed in the hands of an attorney for collection or enforcement by the first party [Neeces/McGinnitys] after default by the second party [Kirks]."

¶68 The McGinnitys also filed a separate motion to tax costs in the amount of $371.00 for payment of a transcript that was part of the record on appeal.[61] They do not rely on any language in the contract for payment of costs, but are successful plaintiffs and entitled to costs pursuant to 12 O.S. 928.[62]

¶69 The motion by the McGinnitys for a reasonable appeal-related attorney's fee is granted, and the trial court shall determine the amount of such fee for appeal and certiorari upon remand. The motion of the McGinnitys to tax costs in the amount of $371.00 is granted.

 

VI. Conclusion

¶70 We hold the value of the property exceeded the amount due on the mortgage and no waste was present, but the district court's finding that the Kirks breached the contract for deed is not against the clear weight of the evidence on the McGinnitys' claims of failure to maintain insurance and the property. The trial court judgment determined the Kirks breached the contract for deed, granted the McGinnitys foreclosure in rem as to the property with attorney's fees and costs, quieted title in and to the McGinnitys against any claims of Komonce and the Kirks, and granted judgment in favor of the McGinnitys and against the Kirks on their counterclaims. We affirm that trial court judgment.

¶71 The Opinion of the Court of Civil Appeals is vacated and the judgment of the district court is affirmed. The motion by the McGinnitys for a reasonable appeal-related attorney's fee is granted, and the trial court shall determine the amount of such fee for appeal and certiorari upon remand. The motion of the McGinnitys to tax costs in the amount of $371.00 is granted.

¶72 COMBS, V. C. J., KAUGER, WATT, WINCHESTER, EDMONDSON, TAYLOR, COLBERT, and GURICH, JJ., concur.

¶73 REIF, C. J., not participating.

FOOTNOTES

[1] Mary Komonce is identified in the appellate record as the mother of Peggy Kirk and the recipient of a quit claim deed to the property from the Kirks. Peggy Kirk stated that she made the deed to her mother for estate planning purposes.

[2] Since we affirm the trial court's judgment foreclosing the property based upon the Kirks' failure to keep insurance and failure to maintain the property in good repair and the trial court's denial of the Kirks' claims, we need not address the additional ground of a breach of contract based upon Peggy Kirk's deed to her mother or the statute of limitations issue raised by the parties. See, e.g., Merritt v. Merritt, 2003 OK 68, ¶ 17, 73 P.3d 878, 883 ("a judgment, if correct, must stand, regardless of the correctness of the reasons, theory or conclusions upon which it was based."); McDaniel v. McCauley, 1962 OK 72, 371 P.2d 486, 489 (same).

[3] 16 O.S.2011 § 11A: "All contracts for deed for purchase and sale of real property made for the purpose or with the intention of receiving the payment of money and made for the purpose of establishing an immediate and continuing right of possession of the described real property, whether such instruments be from the debtor to the creditor or from the debtor to some third person in trust for the creditor, shall to that extent be deemed and held mortgages, and shall be subject to the same rules of foreclosure and to the same regulations, restraints and forms as are prescribed in relation to mortgages. No foreclosure shall be initiated, nor shall the court allow such proceedings, unless the documents have been filed of record in the county clerk's office, and mortgage tax paid thereon, in the amount required for regular mortgage transactions. Provided, however, mutual help and occupancy agreements executed by an Indian housing authority created pursuant to Section 1057 of Title 63 of the Oklahoma Statutes shall not be considered to be mortgages or contracts for deed under the provisions of this section."

[4] Lucas v. Bishop, 1998 OK 16, ¶ 4, 956 P.2d 871, 873 (parties agreed that 16 O.S. § 11A required a contract for deed to be treated as a mortgage for the purpose of foreclosure); Smith v. Frontier Federal Savings & Loan Ass'n, 1982 OK 90, 649 P.2d 536, 538 (for the purpose of applying 16 O.S. § 11A and a due-on-sale clause in a prior mortgage, a contract for deed in this case was not a subordinate mortgage, but a purchase money mortgage where buyer obtained equitable title and sellers retained title pending full payment on the contract for deed).

[5] Mid-State Homes, Inc. v. Donnelly, 1978 OK 15, 574 P.2d 1036, 1037. See Continental Federal Sav. and Loan Ass'n v. Fetter, 1977 OK 96, 564 P.2d 1013, 1019 ("Foreclosure of a real estate mortgage is an equitable action, and it is within the province of the court exercising its equitable power to see that the party seeking equity shall have dealt fairly before relief is given.").

[6] Paris Bank of Texas v. Custer, 1984 OK 5, 681 P.2d 71, 76, citing Story v. Hefner, 1975 OK 115, 540 P.2d 562, 566.

[7] Jaffe-Spindler Co. v. Genesco, Inc., 747 F.2d 253, 257 (4th Cir. 1984) quoting 78 Am. Jur. 2d Waste § 1 (1975) (Waste is "the destruction, misuse, alteration or neglect of premises by one lawfully in possession thereof, to the prejudice of the estate or interest therein of another."); Black's Law Dictionary, 1589 (6th ed. 1990) (Defining waste, in part, as "action or inaction by a possessor of land causing unreasonable injury to the holders of other estates in the same land...."); Black's Law Dictionary, 1760 (4th ed. 1951) (Defining waste, in part, as "an abuse or destructive use of property by one in rightful possession....").

[8] Jones, Leonard A., 2 A Treatise on the Law of Mortgages of Real Property (Indianapolis, Bobbs-Merrill, 7th ed. 1915) § 684 ("A mortgagor in possession, or any one claiming under him, who is about to cut timber, remove fixtures, or commit other waste on the land, to an extent calculated to render the security inadequate, may be restrained by injunction...."); 4 Pomeroy's Equity Jurisprudence, § 1348, p. 2681 (3d ed. 1905) ("The remedy by injunction [for waste] is fully established, and has not only virtually superseded the old common-law 'action of waste,' but has to a great extent taken the place of the 'action on the case' for damages. An injunction will be granted in all cases where a legal action would lie to recover possession of the land wasted, or to recover damages.").

[9] Atlantic Coast Line R. Co. v. Rutledge, 122 Fla. 154, 165 So. 563, 564 (1935) (a mortgagee may have an action on the case for damages resulting from wrongful injury to the mortgaged property, whereby the property is rendered of less value as security for the mortgage debt; the damages to be awarded being the amount of injury to the security resulting from the damage to the property); Jones, Leonard A., 2 A Treatise on the Law of Mortgages of Real Property, at § 687 ("A mortgagor in possession is the owner of the estate, and may exercise all the rights of ownership, and even commit waste, provided he does not diminish the security or render it insufficient. For an injury to his security by waste, a mortgagee may have an action on the case for damages.").

[10] Phillips v. Hill, 1976 OK 108, 555 P.2d 1043.

[11] Appellants' Waiver of Reply Brief, August 13, 2012, at 1. Appellants' Waiver of Reply Brief includes legal argument and citation to authorities that are made in support of an argument in their appellate brief. Due to its argument and citations it possesses the substance of a Reply Brief although it does not conform to the requirements set forth by Okla. Sup. Ct. R. 1.11 for the form and content of appellate briefs. We have considered herein the argument made in the Waiver.

[12] Phillips v. Hill, 555 P.2d at 1047.

[13] Phillips v. Hill, 555 P.2d at 1046.

[14] Phillips v. Hill, 555 P.2d at 1044.

[15] Lincoln Mortg. Investors v. Cook, 1982 OK 137, 659 P.2d 925, 927 (The doctrine prohibiting clogs on the equitable right of redemption is codified in 42 O.S. 1981 [now 2011] § 11, and "the doctrine voids any provision in an original mortgage agreement limiting or modifying the right of redemption by payment of the full mortgage debt after default for any reason.").

[16] Sooner Federal Savings and Loan Ass'n v. Oklahoma Cent. Credit Union, 1989 OK 170, n. 4, 790 P.2d 526, 528 (the right of redemption is exercised by payment of the mortgage debt to create a property title free and clear of the mortgage by complete performance of the mortgage obligation.). Cf. Jones, Leonard A., 1 A Treatise on the Law of Mortgages of Real Property, at § 11 ("A mortgage is one thing at law and another in equity; in one court it is an estate, and in the other a security only."); Kenneth C. Kettering, True Sale of Receivables: A Purposive Analysis, 16 Am. Bankr. Inst. L. Rev. 511, 527 (2008) (In a discussion of the history of real estate mortgages the author stated: "By the end of the sixteenth century, however, the debtor was permitted as a matter of right to redeem the land by paying his debt, with interest, within a reasonable time after the law date. This right became known as the debtor's 'equity of redemption,' and in time that right came to mean not only a personal right to pay late, but a continuing estate in the land on the part of the seller, amounting to an ownership interest, until his right to redeem was terminated ['foreclosed'.]).

[17] Wilson v. Glancy, 1995 OK 141, 913 P.2d 286, 290 ("The mortgagor may not be divested of title until the right to redeem is extinguished by foreclosure decree and foreclosure sale, and the right to redeem is defined by 42 O.S.1991 [now 2011] 2011 § 18," which reads in part: "Every person having an interest in property subject to a lien, has a right to redeem it from the lien, at any time after the claim is due, and before his right of redemption is foreclosed."); Sooner Federal Savings and Loan Ass'n v. Oklahoma Cent. Credit Union, 1989 OK 170, 790 P.2d 526, 531 ("we hold today that (a) equity of redemption is transferable and is not extinguished until foreclosure sale is confirmed ....").

[18] 1988 OK 52, 756 P.2d 588.

[19] Article I, § 10, cl. 1, of the United States Constitution restricts the authority of a State from passing "any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts...." Article II, § 15, of the Oklahoma Constitution provides "No bill of attainder, ex post facto law, nor any law impairing the obligation of contracts, shall ever be passed."

[20] Okla. Const. Art 2 § 6: "The courts of justice of the State shall be open to every person, and speedy and certain remedy afforded for every wrong and for every injury to person, property, or reputation; and right and justice shall be administered without sale, denial, delay, or prejudice."

[21] 756 P.2d at 591-592. The Court explained in Federal Land Bank of Wichita that its review was simplified by stare decisis because the identical issue was addressed in State ex rel. Roth v. Waterfield, 1933 OK 546, 29 P.2d 24. Federal Land Bank of Wichita, 756 P.2d at 591.

[22] See Jones and Pomeroy cited in note 8 supra.

[23] The McGinnitys' counsel argued at trial that "at any point the Kirks could have tendered the redemption price and received it [the property] back, and they did not."

[24] Lawton v. Lincoln, 1948 OK 82, 191 P.2d 926, 928 ("Inspection of the record convinces us that the judgment of the trial court [denying foreclosure] was correct. . . The evidence clearly reflects that the defaults upon which the action is predicated did not render the mortgage security inadequate.")

[25] We note that counsel for the McGinnitys argued at trial that the pleadings were amended on this point by the pretrial order, and we need not examine the intervening pleadings since "The contents of the pretrial order shall supersede the pleadings and govern the trial of the case unless departure therefrom is permitted by the Court to prevent manifest injustice." Corman v. H-30 Drilling, Inc., 2001 OK 92, ¶ 13, 40 P.3d 1051, citing 12 O.S. Ch. 2, App., Oklahoma Rules for District Courts, Rule 5(I). This language remained unchanged in the 2013 amendment to Rule 5. In re Amendments to Oklahoma Supreme Court Rules, 2013 OK 68.

[26] James Kirk stated that he could have purchased insurance but declined because of his move. There is no record or argument by the Kirks that their purchase of insurance was hindered by the McGinnitys entering the property and making changes thereto, or in the alternative that the Kirks were prohibited from, or failed in seeking, equitable relief from the judge's order if such had been necessary to obtain insurance. Cf. Padberg v. Rigney, 1950 OK 169, 227 P.2d 661 (a real estate lease with an option agreement would not be forfeited where lessee was unable to make required payments due to the fault or inequitable conduct of the lessor.).

[27] Oklahoma Dept. of Securities ex rel. Faught v. Blair, 2010 OK 16, n. 41, 231 P.3d 645, 668 (upon entry of a judgment a cause of action is merged into the judgment and the cause of action ceases to exist); Cassidy & McFadden v. Saline County Bank, 7 Ind. T. 543, 104 S.W. 829 (1907) (explaining Freeman on Judgments (4th Ed.) § 215, "The cause of action, though it may be examined to aid in interpreting the judgment, can never again become the basis of a suit between the same parties.").

Although the general rule is that the old contractual debt is replaced by a new debt on a judgment, certain rights and liabilities are preserved although contract-based rights and obligations have been replaced with judgment-based rights and obligations. Johnson v. State ex rel. Department of Public Safety, 2000 OK 7, ¶ 11, 2 P.3d 334, 337 ("When a cause of action is extinguished because it is merged into a judgment, the advantages which attached to the original claim may be preserved. . . a lien is not extinguished merely because a creditor obtains a judgment against a debtor.").

[28] State ex rel. Com'rs of Land Office v. Whitfield, 1948 OK 108, 193 P.2d 306, 308 explaining Board of Ed. of City of Drumright v. Board of Com'rs of Creek Cnty, 1935 OK 379, 43 P.2d 139, (a judgment creditor may not possess an action on the judgment in circumstances where party may have full benefit of the original judgment).

[29] 12 O.S. 2011 § 2015 (B): " B. AMENDMENTS TO CONFORM TO THE EVIDENCE. When issues not raised by the pleadings or by the pretrial conference order, where the order has superseded the pleadings, are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings or the pretrial conference order. Such amendment as may be necessary to cause the pleadings or the pretrial conference order to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings or the pretrial conference order, the court may allow the pleadings or the pretrial conference order to be amended and shall do so freely when the presentation of the merits of the action will be served thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

Where the pretrial conference order has superseded the pleadings, it is sufficient to amend the order and the pleadings shall not be amended."

[30] Parker v. Elam, 1992 OK 32, 829 P.2d 677, 682 ("A judgment, reversed and remanded, stands as if no trial has been held. Ordinarily, amendments can be made to the pleadings and additional evidence can be offered on remand."); Anderson v. Beidleman, 1947 OK 46, 178 P.2d 81 (Syllabus by the Court) ("Where a cause has been reversed and remanded for further proceedings 'not inconsistent with the views expressed', its status thereafter in the court below is ordinarily the same as though no trial had been held, and pleadings may be amended and new issues formed not inconsistent with the views expressed in the opinion.").

[31] 59A C. J. S. Mortgages § 980, Supplemental Pleadings (2015) collected citations including Van Meter v. Field, 1947 OK 342, 187 P.2d 245, where the mortgagee paid taxes and insurance during the foreclosure proceeding and appeal, and the "same were proper charges under the mortgage and could properly be asserted in supplemental petition in foreclosure." Van Meter, 187 P.2d at 246 (Syllabus by the Court).

[32] Extension Oil Co. v. Richfield Oil Corp., 52 Cal.App.2d 105, 125 P.2d 895, 897 (1942) citing McGlynn v. Moore, 25 Cal. 384 (1912), and noting the difference between "to keep insured" and to "insure on or before a time certain." See also Black's Law Dictionary, 364 (6th ed. 1990) defining continuing covenant: "One which indicates or necessarily implies the doing of stipulated acts successively or as often as the occasion may require; as, a covenant to pay rent by installments, to keep the premises in repair or insured, to cultivate land, etc."

[33] Tom McGinnity argued at trial that while he and his wife "entered" the property in 2005 to make changes necessary for obtaining insurance, they did not "possess" the property until the foreclosure sale in 2006. We need not address when legal possession occurred because of our conclusion that the contract for deed and § 11A granted the Kirks status as mortgagor for the purpose of right to possession and the contractual duty to maintain insurance continued with the mortgagor status.

[34] State Life Ins. Co. v. State ex rel., Kehn, 1942 OK 385, 135 P.2d 965.

[35] Delk v. Markel American Insurance Co., 2003 OK 88, ¶ 11, 81 P.3d 629, 636.

[36] Carr v. Union Mut. Ins. Co., 1979 OK CIV APP 15, 598 P.2d 269, 270-271 (Released for Publication by Order of the Supreme Court) quoting 3 Couch on Insurance 2d, § 24:70, p. 155.

[37] In Rogers v. Bailey, 2011 OK 69, 261 P.3d 1150, we explained that a forcible entry and detainer proceeding is not for the purpose of trying title, but is a "possessory action" for possession of the premises, and we and we distinguished it from an action in ejectment where the plaintiff alleges and proves (1) plaintiff's title; (2) plaintiff's right of possession; and (3) wrongful possession of defendant. During the post-appeal remand the McGinnitys argued they were not seeking relief in the nature of forcible entry and detainer.

[38] The Kirks filed a motion (and brief) to vacate the default judgment, and supplemental material. The motion and material did not address 16 O.S. § 11A and a claim to possession thereunder. The order on their motion to vacate refers to arguments made by the parties and certain statutes, but no mention of 16 O.S. § 11A is made. The Kirks filed a motion to stay execution and no reference is made to 16 O.S. § 11A. The Kirks filed an objection to the motion to confirm the sale. No reference is made to 16 O.S. § 11A. The Kirks filed a response to a request that the trial court rule on the motion to confirm sale. No mention of a possessory right during foreclosure under § 11A is made. The Kirks filed a cross-petition in April 2008, and pled that abuse of process occurred by the McGinnitys' use of a forcible entry and detainer procedure, and that the Kirks were wrongfully ejected from their property. The record on appeal does not appear to show any argument with authority that mortgage foreclosure procedure, with its associated mortgagor possessory right, should be followed until the Kirks' cross-petition.

[39] 12 O.S.2011 § 762: Lien restricted to property levied on when two-thirds of appraised value sufficient to satisfy judgment--Amount for which property sold--Sale for debt or taxes due state.

If, upon such return, as aforesaid, it appear, by the inquisition, that two-thirds (2/3) of the appraised value of said lands and tenements, so levied upon is sufficient to satisfy the execution, with costs, the judgment on which such execution issued shall not operate as a lien on the residue of the debtor's estate, to the prejudice of any other judgment creditor; but no such property shall be sold for less than two-thirds (2/3) of the value returned in the inquest; and nothing in this section contained shall, in any wise, extend to affect the sale of lands by the state, but all lands, the property of individuals indebted to the state for any debt or taxes, or in any other manner, shall be sold without valuation, for the discharge of such debt or taxes, agreeably to the laws in such cases made and provided.

[40] The parties do not discuss the effect, if any, of the order confirming sale as it relates to the appellate mandate in appeal No. 102,126 and the post-mandate proceedings in the district court. We need not explain the parties' rights and obligations during this period since the parties do not address the issue and the Kirks failed to keep insurance.

[41] Teachers Ins. and Annuity Assn. of America v. Oklahoma Tower Associates Limited Partnership, 1990 OK 97, 798 P.2d 618, 619-620.

[42] First National Bank of Davis v. Currie, 1924 OK 1143, 232 P. 94, 95.

[43] Jones, 1 A Treatise on the Law of Mortgages of Real Property, § 78, collecting opinions from Connecticut, Illinois, Iowa, Michigan, New Jersey and Texas. See also Abbott v. Southern Cotton Oil Co., 237 Ala. 569, 188 So. 68, 69 (1939) citing 41 Corpus Juris 414; 1 Jones on Mortgages, § 78; Moore v. Crandall, 146 Iowa 25, 124 N.W. 812, 140 Am.St.Rep. 276 (1910).

[44] 190 Kan. 170, 373 P.2d 219 (1962).

[45] Farmers & Merchants Bank, 373 P.2d at 173.

[46] This case does not involve a policy cancellation due to a mortgagor's failure to pay a premium. We are not called upon to explain either (1) a common mortgage clause in a fire insurance policy providing that a mortgagee shall pay a premium on notice of a mortgagor's failure to do so, or (2) loss payable and standard policy mortgage clauses in policies and rights of mortgagees thereunder. But see, 5 Couch on Insurance, § 74:17, Mortgagees-Duty of mortgagee to pay upon default of mortgagor (3d ed., updated 2015) (different views of insurance policy clause for payment of premium by mortgagee upon notice of nonpayment by the mortgagor, and whether the clause is an express covenant to pay or a condition, and citing as examples Stoddart v. Black, 134 Kan. 838, 8 P.2d 305, 83 A.L.R. 100 (1932) (mortgage clause in policy was a mortgagee obligation for payment) and Stevens Ins., Inc. v. Howells, 155 Mont. 494, 473 P.2d 523 (1970) (vendor under contract for deed was not liable for payment of vendee's contract-required insurance when vendor had not contracted with insurance agency to pay premium); Wilson v. Glancy, 1995 OK 41, 913 P.2d 286 ("There are two types of insurance policy clauses which protect the mortgage lender against hazards of loss or damage to mortgaged premises: (1) the loss payable clause and (2) the standard mortgage clause"); and Conner v. Northwestern Nat. Cas. Co., 1989 OK 85, 774 P.2d 1055, 1056 (explaining in that case an endorsement "protecting a mortgagee under a loss payee clause").

[47] See, e.g., Smith & Furbush Mach. Co. v. Huycke, 1918 OK 618, 177 P. 919 ("It is a well-established rule that when, by the terms of a mortgage, it is the duty of the mortgagor to keep the property insured for the benefit of the mortgagee, and the mortgagor takes out a policy in his own name and does not assign it or make it payable to the mortgagee, and a loss occurs, such agreement creates an equitable lien in favor of the mortgagee to the extent of the mortgage indebtedness upon the money due under the policy of insurance; and this is true, even though the mortgagee under the power contained in the mortgage, in default of insurance by the mortgagor, may insure the property at the expense of the mortgagor.").

[48] Public Service Co. of Oklahoma v. State ex rel. Oklahoma Corp. Com'n, 2005 OK 47, ¶ 54, 115 P.3d 861, 884 ("Extant applicable law is a part of every contract in this state as if it were expressly cited or its terms incorporated in the contract."); Welty v. Martinaire of Oklahoma, Inc., 1994 OK 10, 867 P.2d 1273, 1276 (same). The contract for deed was executed on October 28, 1987, and 16 O.S. § 11A in its present form had been created four years previously by Laws 1983, c. 108, § 1, emerg. eff. May 12, 1983.

[49] Walker v. Builddirect.Com Technologies, Inc., 2015 OK 30, ¶ 14, 349 P.3d 549, 554 ("A contract must be so interpreted as to give effect to the mutual intention of the parties, as it existed at the time of contracting, so far as the same is ascertainable and lawful.").

[50] Generally a party seeking to enforce his or her rights granted by an agreement must perform his or her obligations imposed by that agreement unless a legal excuse exists. See, e.g., Sunrizon Homes, Inc. v. American Guar. Inv. Corp., 1988 OK 145, 782 P.2d 103, 107 ("Generally, contracts are either valid or void in their entirety, and cannot be partially rescinded.").

[51] Haworth v. Jantzen, 2006 OK 35, ¶ 13, & n.4, 172 P.3d 193, 196. See 15 O.S.2011 § 157: "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the others."

[52] Restatement (Second) of Contracts, § 203(a) (1981) ("[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect.").

[53]The record on appeal contains a partial transcript of the jury trial held in October 2010. The parties agreed to include the transcript as testimony in the bench trial. Testimony of Claudia McGinnity and some witnesses is taken from this transcript.

[54] Burdick v. Independent School District No. 52, 1985 OK 49, 702 P.2d 48, 54 ("a general decree or judgment is deemed to include every specific finding on any and all issues necessary to sustain it.").

[55] Fry v. Hurst, 1956 OK 28, 293 P.2d 552 ("Where the evidence is conflicting as to the existence of facts ... the findings of the trial court thereon will not be disturbed where they are not against the clear weight of the evidence.") (Syllabus by the Court).

[56] Callaway v. Parkwood Village, L.L.C., 2000 OK 24, ¶ 5, 1 P.3d 1003, 1004, quoting Greenberg v. Wolfberg, 1994 OK 147, 890 P.2d 895, 905.

[57] Hertz v. Luzenac Group, 576 F.3d 1103, 1117(10th Cir. 2009) citing to Colorado cases and Restatement (Second) of Torts, § 682 cmt. b (1977) (emphasis added) ("[T]here is no action for abuse of process when the process is used for the purpose for which it is intended, but there is an incidental motive of spite or an ulterior purpose of benefit to the defendant.").

[58] Greenberg v. Wolfberg, 1994 OK 147, 890 P.2d 895, 905. See also Neil v. Pennsylvania Life Ins. Co., 1970 OK 172, 474 P.2d 961, 965 ("abuse of process is the employment of a process in a manner not contemplated by law, or to obtain an object which such a process is not intended by law to effect.").

[59] Restatement (Second) of Torts, § 682, Comment (a) states in part: "Therefore, it is immaterial . . . that the proceedings terminated in favor of the person instituting or initiating them."

[60] Eagle Bluff, L.L.C. v. Taylor, 2010 OK 47, ¶ 15, 237 P.3d 173, 179.

[61] Costs must be sought by a separately filed and labeled motion in the appellate court prior to mandate being issued. Okla. Sup. Ct. R. 1.14 (A), 12 O.S.Supp.2014 Ch. 15, App.1.

[62] 12 O.S.2011 § 928: "Where it is not otherwise provided by this and other statutes, costs shall be allowed of course to the plaintiff, upon a judgment in his favor, in actions for the recovery of money only, or for the recovery of specific, real or personal property." For certain purposes, an appeal is a continuation of the trial court proceeding. Tulsa Industrial Authority v. City of Tulsa, 2011 OK 57, n. 28, 270 P.3d 113.

 

 

 

 

 

 





 Citationizer© Summary of Documents Citing This Document
 
 
 Cite
 Name
 Level
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 Cite
 Name
 Level
 
 
 Oklahoma Court of Civil Appeals Cases
 Cite
Name
Level

 1979 OK CIV APP 15, 598 P.2d 269, CARR v. UNION MUT. INS. CO.
Discussed
Oklahoma Supreme Court Cases
 Cite
Name
Level

 1988 OK 52, 756 P.2d 588, 59 OBJ 1212, Federal Land Bank of Wichita v. Story
Discussed
 1988 OK 145, 782 P.2d 103, 59 OBJ 3468, Sunrizon Homes, Inc. v. American Guar. Inv. Corp.
Discussed
 1989 OK 85, 774 P.2d 1055, 60 OBJ 1400, Conner v. Northwestern Nat. Cas. Co.
Discussed
 1989 OK 170, 790 P.2d 526, 60 OBJ 2842, Sooner Federal Sav. and Loan Ass'n v. Oklahoma Cent. Credit Union
Discussed at Length
 1990 OK 97, 798 P.2d 618, 61 OBJ 2533, Teachers Ins. and Annuity Ass'n of America v. Oklahoma Tower Associates Ltd. Partnership
Discussed
 1992 OK 32, 829 P.2d 677, 63 OBJ 696, Parker v. Elam
Discussed
 1947 OK 46, 178 P.2d 81, 198 Okla. 324, ANDERSON v. BEIDLEMAN
Discussed
 1994 OK 10, 867 P.2d 1273, 65 OBJ 457, Welty v. Martinaire of Oklahoma, Inc.
Discussed
 1947 OK 342, 187 P.2d 245, 199 Okla. 390, VAN METER v. FIELD
Discussed
 1994 OK 147, 890 P.2d 895, 65 OBJ 4220, Greenberg v. Wolfberg
Discussed at Length
 1956 OK 28, 293 P.2d 552, FRY v. HURST
Discussed
 2001 OK 92, 40 P.3d 1051, 73 OBJ 878, CORMAN v. H-30 DRILLING, INC.
Discussed
 1918 OK 618, 177 P. 919, 72 Okla. 30, SMITH & FURBUSH MACH. CO. v. HUYCKE
Discussed
 1935 OK 379, 43 P.2d 139, 171 Okla. 464, BOARD OF EDUC. OF DRUMRIGHT v. BOARD OF COM'RS OF CREEKCOUNTY
Discussed
 1962 OK 72, 371 P.2d 486, McDANIEL v. McCAULEY
Discussed
 1933 OK 546, 29 P.2d 24, 167 Okla. 209, STATE ex rel. ROTH v. WATERFIELD
Discussed
 1995 OK 41, 894 P.2d 1116, 66 OBJ 1422, Crussel v. Kirk
Cited
 1970 OK 172, 474 P.2d 961, NEIL v. PENNSYLVANIA LIFE INSURANCE COMPANY
Discussed
 1995 OK 141, 913 P.2d 286, 66 OBJ 3909, Wilson v. Glancy
Discussed at Length
 2003 OK 68, 73 P.3d 878, MERRITT v. MERRITT
Discussed
 2003 OK 88, 81 P.3d 629, DELK v. MARKEL AMERICAN INSURANCE COMPANY
Discussed
 2005 OK 47, 115 P.3d 861, PUBLIC SERVICE CO. OF OKLA. v. STATE ex rel. OKLA. CORP. COMM'N
Discussed
 2006 OK 35, 172 P.3d 193, HAWORTH v. JANTZEN
Discussed
 2010 OK 16, 231 P.3d 645, DEPT. OF SECURITIES ex rel. FAUGHT v. BLAIR
Discussed
 2010 OK 47, 237 P.3d 173, EAGLE BLUFF, L.L.C. v. TAYLOR
Discussed
 2011 OK 57, 270 P.3d 113, TULSA INDUSTRIAL AUTHORITY v. CITY OF TULSA
Discussed
 2011 OK 69, 261 P.3d 1150, ROGERS v. BAILEY
Discussed
 1924 OK 1143, 232 P. 94, 105 Okla. 175, FIRST NAT. BANK v. CURRIE
Discussed
 1975 OK 115, 540 P.2d 562, STORY v. HEFNER
Discussed
 2013 OK 68, IN RE AMENDMENTS TO OKLAHOMA SUPREME COURT RULES
Cited
 1976 OK 108, 555 P.2d 1043, PHILLIPS v. HILL
Discussed
 1977 OK 96, 564 P.2d 1013, CONTINENTAL FED. SAV. & LOAN ASS'N v. FETTER
Discussed
 2015 OK 30, 349 P.3d 549, WALKER v. BUILDDIRECT.COM TECHNOLOGIES INC.
Discussed
 1978 OK 15, 574 P.2d 1036, MID-STATE HOMES, INC. v. DONNELLY
Discussed
 2000 OK 7, 2 P.3d 334, 71 OBJ 404, Johnson v. State ex. rel. Dept. of Public Safety
Discussed
 2000 OK 24, 1 P.3d 1003, 71 OBJ 943, Callaway v. Parkwood Village, L.L.C.
Discussed
 1982 OK 90, 649 P.2d 536, Smith v. Frontier Federal Sav. and Loan Ass'n
Discussed
 1982 OK 137, 659 P.2d 925, Lincoln Mortg. Investors v. Cook
Discussed
 1950 OK 169, 227 P.2d 661, 204 Okla. 131, PADBERG v. RIGNEY
Discussed
 1948 OK 82, 191 P.2d 926, 200 Okla. 182, LAWTON v. LINCOLN
Discussed
 1948 OK 108, 193 P.2d 306, 200 Okla. 300, STATE ex rel. COMMISSIONERS OF LAND OFFICE v. WHITFIELD
Discussed
 1998 OK 16, 956 P.2d 871, 69 OBJ 847, LUCAS v. BISHOP
Discussed
 1942 OK 385, 135 P.2d 965, 192 Okla. 271, STATE LIFE INS. CO. v. STATE ex rel. KEHN
Discussed
 1984 OK 5, 681 P.2d 71, Paris Bank of Texas v. Custer
Discussed
 1985 OK 49, 702 P.2d 48, Burdick v. Independent School Dist. No. 52 of Oklahoma County
Discussed
Title 12. Civil Procedure
 Cite
Name
Level

 12 O.S. 990.4, Stay of Enforcement of Judgment, Decree, or Final Order
Cited
 12 O.S. 762, Property Not to Be Sold for Less Than Two-Thirds of Value Sufficient to Satisfy Judgment
Cited
 12 O.S. 928, Costs Allowed to Plaintiff upon Judgment in His Favor in Actions for Recovery of Money or Property
Cited
 12 O.S. 2015, Amended and Supplemental Pleadings
Discussed
Title 15. Contracts
 Cite
Name
Level

 15 O.S. 157, Whole of Contract Taken Together
Cited
Title 16. Conveyances
 Cite
Name
Level

 16 O.S. 11A, Constructive Mortgage
Discussed at Length
Title 42. Liens
 Cite
Name
Level

 42 O.S. 11, Contracts for Forfeiture of Property Subject to Lien and in Restraint of Right of Redemption - Void
Cited
 42 O.S. 18, Right to Redeem Lien - Federal Right of First Refusal
Cited
Title 62. Public Finance
 Cite
Name
Level

 62 O.S. 492, Unconstitutional
Cited